## NATIONAL LABOR RELATIONS BOARD *v.* NATURAL GAS UTILITY DISTRICT OF HAWKINS COUNTY, TENNESSEE

No. 785.   Argued April 20, 1971.—Decided June 1, 1971

Brennan, J., delivered the opinion of the Court, in which Burger, C. J., and Black, Douglas, Harlan, White, Marshall, and Blackmun, JJ., joined. Stewart, J., filed a dissenting opinion, *post*, p. 609.

*Dominick L. Manoli* argued the cause for petitioner. With him on the brief were *Solicitor General Griswold, Peter L. Strauss, Arnold Ordman,* and *Norton J. Come.*

*Eugene Greener, Jr.,* argued the cause and filed a brief for respondent.

*Charles F. Wheatley, Jr.,* and *Jerome C. Muys* filed a brief for the American Public Gas Association as *amicus curiae* urging affirmance.

Mr. Justice Brennan delivered the opinion of the Court.

Upon the petition of Plumbers and Steamfitters Local 102, the National Labor Relations Board ordered that a representation election be held among the pipefitters employed by respondent, Natural Gas Utility District of Hawkins County, Tennessee, 167 N. L. R. B. 691 (1967). In the representation proceeding, respondent objected to the Board's jurisdiction on the sole ground that as a "political subdivision" of Tennessee, it was not an "employer" subject to Board jurisdiction under § 2 (2) of the National Labor Relations Act, as amended by the Labor Management Relations Act, 1947, 61 Stat. 137, 29 U. S. C. § 152 (2).[1] When the Union won the election

---

[1] Section 2 (2), 29 U. S. C. § 152 (2), provides:

"The term 'employer' includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any

and was certified by the Board as bargaining representative of the pipefitters, respondent refused to comply with the Board's certification and recognize and bargain with the Union. An unfair labor practice proceeding resulted and the Board entered a cease-and-desist order against respondent on findings that respondent was in violation of §§ 8 (a)(1) and 8 (a)(5) of the Act, 29 U. S. C. §§ 158 (a)(1) and 158 (a)(5). 170 N. L. R. B. 1409 (1968). Respondent continued its noncompliance and the Board sought enforcement of the order in the Court of Appeals for the Sixth Circuit. Enforcement was refused, the court holding that respondent was a "political subdivision," as contended. 427 F. 2d 312 (1970). We granted certiorari, 400 U. S. 990 (1971). We affirm.

The respondent was organized under Tennessee's Utility District Law of 1937, Tenn. Code Ann. §§ 6–2601 to 6-2627 (1955). In *First Suburban Water Utility District* v. *McCanless,* 177 Tenn. 128, 146 S. W. 2d 948 (1941), the Tennessee Supreme Court held that a utility district organized under this Act was an operation for a state governmental or public purpose. The Court of Appeals held that this decision "was of controlling importance on the question whether the District was a political subdivision of the state" within § 2 (2) and "was binding on the Board." 427 F. 2d, at 315. The Board, on the other hand, had held that "while such State law declarations and interpretations are given careful consideration . . . , they are not necessarily controlling." 167 N. L. R. B., at 691. We disagree with the Court of Appeals and agree with the Board. Federal,

corporation or association operating a hospital, if no part of the net earnings inures to the benefit of any private shareholder or individual, or any person subject to the Railway Labor Act, as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization."

rather than state, law governs the determination, under § 2 (2), whether an entity created under state law is a "political subdivision" of the State and therefore not an "employer" subject to the Act.[2]

The Court of Appeals for the Fourth Circuit dealt with this question in *NLRB* v. *Randolph Electric Membership Corp.*, 343 F. 2d 60 (1965), where the Board had determined that Randolph Electric was not a "political subdivision" within § 2 (2). We adopt as correct law what was said at 62–63 of the opinion in that case:

> "There are, of course, instances in which the application of certain federal statutes may depend on state law. . . .
>
> "But this is controlled by the will of Congress. In the absence of a plain indication to the contrary, however, it is to be assumed when Congress enacts a statute that it does not intend to make its application dependent on state law. Jerome v. United States, 318 U. S. 101, 104 . . . (1943).
>
> "The argument of the electric corporations fails to persuade us that Congress intended the result for which they contend. Furthermore, it ignores the teachings of the Supreme Court as to the congressional purpose in enacting the national labor laws. In National Labor Relations Board v. Hearst Publications, 322 U. S. 111, 123 . . . (1944), the Court dealt with the meaning of the term 'employee' as used in the Wagner Act, saying:
>
> " 'Both the terms and the purposes of the statute, as well as the legislative history, show that Congress had in mind no . . . patchwork plan for securing freedom of employees' organization and of collective bargaining. The Wagner Act is federal legislation,

---

[2] Respondent agrees in its brief in this Court, p. 13, that state law is not controlling.

administered by a national agency, intended to solve a national problem on a national scale. . . . Nothing in the statute's background, history, terms or purposes indicates its scope is to be limited by . . . varying local conceptions, either statutory or judicial, or that it is to be administered in accordance with whatever different standards the respective states may see fit to adopt for the disposition of unrelated, local problems.'

"Thus, it is clear that state law is not controlling and that it is to the actual operations and characteristics of [respondents] that we must look in deciding whether there is sufficient support for the Board's conclusion that they are not 'political subdivisions' within the meaning of the National Labor Relations Act."

We turn then to identification of the governing federal law. The term "political subdivision" is not defined in the Act and the Act's legislative history does not disclose that Congress explicitly considered its meaning. The legislative history does reveal, however, that Congress enacted the § 2 (2) exemption to except from Board cognizance the labor relations of federal, state, and municipal governments, since governmental employees did not usually enjoy the right to strike.[3] In the light of that purpose, the Board, according to its Brief, p. 11, "has limited the exemption for political subdivisions to entities that are either (1) created directly by the state, so as to constitute departments or administrative arms of the government, or (2) administered by individuals who

---

[3] See 78 Cong. Rec. 10351 *et seq.;* Hearings on Labor Disputes Act before the House Committee on Labor, 74th Cong., 1st Sess., 179; 93 Cong. Rec. 6441 (Sen. Taft). See also C. Rhyne, Labor Unions and Municipal Employee Law 436–437 (1946). Vogel, What About the Rights of the Public Employee?, 1 Lab. L. J. 604, 612–615 (1950).

are responsible to public officials or to the general electorate."

The Board's construction of the broad statutory term is, of course, entitled to great respect. *Randolph Electric, supra,* at 62. This case does not however require that we decide whether "the actual operations and characteristics" of an entity must necessarily feature one or the other of the Board's limitations to qualify an entity for the exemption, for we think that it is plain on the face of the Tennessee statute that the Board erred in its reading of it in light of the Board's own test. The Board found that "the Employer in this case is neither created directly by the State, nor administered by State-appointed or elected officials." 167 N. L. R. B., at 691–692 (footnotes omitted). But the Board test is not whether the entity is administered by "State-appointed or elected officials." Rather, alternative (2) of the test is whether the entity is "administered *by individuals who are responsible to public officials* or to the general electorate" (emphasis added), and the Tennessee statute makes crystal clear that respondent is administered by a Board of Commissioners appointed by an elected county judge, and subject to removal proceedings at the instance of the Governor, the county prosecutor, or private citizens. Therefore, in the light of other "actual operations and characteristics" under that administration, the Board's holding that respondent "exists as an essentially private venture, with insufficient identity with or relationship to the State of Tennessee," 167 N. L. R. B., at 691, has no "warrant in the record" and no "reasonable basis in law." *NLRB* v. *Hearst Publications,* 322 U. S. 111, 131 (1944).

Respondent is one of nearly 270 utility districts established under the Utility District Law of 1937. Under that statute, Tennessee residents may create districts to provide a wide range of public services such as the

furnishing of water, sewers, sewage disposal, police protection, fire protection, garbage collection, street lighting, parks, and recreational facilities as well as the distribution of natural gas. Tenn. Code Ann. § 6–2608 (Supp. 1970). Acting under the statute, 38 owners of real property submitted in 1957 a petition to the county court of Hawkins County requesting the incorporation of a utility district to distribute natural gas within a specified portion of the county. The county judge, after holding a required public hearing and making required findings that the "public convenience and necessity requires the creation of the district," and that "the creation of the district is economically sound and desirable," Tenn. Code Ann. § 6–2604 (Supp. 1970), entered an order establishing the District. The judge's order and findings were appealable to Tennessee's appellate courts by any party "having an interest in the subject-matter." Tenn. Code Ann. § 6–2606 (1955).

To carry out its functions, the District is granted not only all the powers of a private corporation, Tenn. Code Ann. § 6–2610 (1955), but also "all the powers necessary and requisite for the accomplishment of the purpose for which such district is created, capable of being delegated by the legislature." Tenn. Code Ann. § 6–2612 (1955). This delegation includes the power of eminent domain, which the District may exercise even against other governmental entities. Tenn. Code Ann. § 6–2611 (1955). The District is operated on a nonprofit basis, and is declared by the statute to be "a 'municipality' or public corporation in perpetuity under its corporate name and the same shall in that name be a body politic and corporate with power of perpetual succession, but without any power to levy or collect taxes." Tenn. Code Ann. § 6–2607 (Supp. 1970). The property and revenue of the District are exempted from all state, county, and municipal taxes, and the District's bonds are similarly

exempt from such taxation, except for inheritance, transfer, and estate taxes.   Tenn. Code Ann. § 6–2626 (1955).

The District's records are "public records" and as such open for inspection.   Tenn. Code Ann. § 6–2615 (Supp. 1970).   The District is required to publish its annual statement in a newspaper of general circulation, showing its financial condition, its earnings, and its method of setting rates.   Tenn. Code Ann. § 6–2617 (Supp. 1970). The statute requires the District's commissioners to hear any protest to its rates filed within 30 days of publication of the annual statement at a public hearing, and to make and to publish written findings as to the reasonableness of the rates.   Tenn. Code Ann. § 6–2618 (1955). The commissioners' determination may be challenged in the county court, under procedures prescribed by the statute.   *Ibid.*

The District's commissioners are initially appointed, from among persons nominated in the petition, by the county judge, who is an elected public official.   Tenn. Code Ann. § 6–2604 (Supp. 1970).   The commissioners serve four-year terms[4] and, contrary to the Board's finding that the State reserves no "power to remove or otherwise discipline those responsible for the Employer's operations," 167 N. L. R. B., at 692, are subject to removal under Tennessee's General Ouster Law, which provides procedures for removing public officials from office for misfeasance or nonfeasance.   Tenn. Code Ann. § 8–2701 *et seq.* (1955); *First Suburban Water Utility District* v. *McCanless*, 177 Tenn., at 138, 146 S. W. 2d, at 952. Proceedings under the law may be initiated by the Governor, the state attorney general, the county prosecutor, or ten citizens.   Tenn. Code Ann. §§ 8–2708, 8–2709, 8–2710 (1955).   When a vacancy occurs, the county

---

[4] The commissioners' initial terms are staggered, with one commissioner appointed to a two-year term, one to a three-year term, and one to a four-year term.  Tenn. Code Ann. § 6–2604 (Supp. 1970).

judge appoints a new commissioner if the remaining two commissioners cannot agree upon a replacement. Tenn. Code Ann. § 6–2614 (Supp. 1970). In large counties, all vacancies are filled by popular election. *Ibid.* The commissioners are generally empowered to conduct the District's business. They have the power to subpoena witnesses and to administer oaths in investigating District affairs, Tenn. Code Ann. § 6–2616 (5) (1955), and they serve for only nominal compensation. Tenn. Code Ann. § 6–2615 (Supp. 1970). Plainly, commissioners who are beholden to an elected public official for their appointment, and are subject to removal procedures applicable to all public officials, qualify as "individuals who are responsible to public officials or to the general electorate" within the Board's test.

In such circumstances, the Board itself has recognized that authority to exercise the power of eminent domain weighs in favor of finding an entity to be a political subdivision. *New Jersey Turnpike Authority,* 33 L. R. R. M. 1528 (1954). We have noted that respondent's power of eminent domain may be exercised even against other governmental units. And the District is further given an extremely broad grant of "all the powers necessary and requisite for the accomplishment of the purpose for which such district is created, capable of being delegated by the legislature." Tenn. Code Ann. § 6–2612 (1955). The District's "public records" requirement and the automatic right to a public hearing and written "decision" by the commissioners accorded to all users betoken a state, rather than a private, instrumentality. The commissioners' power of subpoena and their nominal compensation further suggest the public character of the District.

Moreover, a conclusion that the District is a political subdivision finds support in the treatment of the District under other federal laws. Income from its bonds is ex-

empt from federal income tax, as income from an obligation of a "political subdivision" under 26 U. S. C. § 103. Social Security benefits for the District's employees are provided through voluntary rather than mandatory coverage since the District is considered a political subdivision under the Social Security Act. 42 U. S. C. § 418.

Respondent is therefore an entity "administered by individuals [the commissioners] who are responsible to public officials [an elected county judge]" and this together with the other factors mentioned satisfies us that its relationship to the State is such that respondent is a "political subdivision" within the meaning of § 2 (2) of the Act. Accordingly, the Court of Appeals' judgment denying enforcement of the Board's order is

*Affirmed.*

MR. JUSTICE STEWART, dissenting.

I agree with the Court that federal, rather than state, law governs the determination of whether an employer is a "political subdivision" of the State within the meaning of § 2 (2) of the National Labor Relations Act, as amended, 29 U. S. C. § 152 (2). But I cannot agree that the Board erred in this case in concluding that the respondent is not entitled to exemption under the Act.

In determining that the respondent Utility District was not a "political subdivision" of the State, the Board followed its settled policy of weighing all relevant factors, with particular emphasis here on the circumstances that the District is neither "created directly by the State" nor "administered by State-appointed or elected officials" and is "autonomous in the conduct of its day-to-day affairs." On the other side, the Board gave less weight to the State's characterization of a utility district as an arm of the State for purposes of exemption from state taxes and conferral of the power of eminent domain. This approach seems wholly acceptable to me, inas-

much as state tax exemption and the power of eminent domain are not attributes peculiar to political subdivisions nor attributes with any discernible impact on labor relations. Attributes which *would* implicate labor policy, such as the payment of wages out of public funds or restrictions upon the right of the employees to strike, are not present here.

The Court points to provisions that the records of the District be available for public inspection, and that the commissioners of the District hold hearings and make written findings. These factors are said to "betoken a state, rather than a private, instrumentality." The question, however, is not whether the District is a state instrumentality, but whether it is a "political subdivision" of the State. And the provisions in question hardly go to that issue.

The Board's reasonable construction of the Act is entitled to great weight and it is not our function to weigh the facts *de novo* and displace its evaluation with our own. The Board here has made a reasoned decision which does no violence to the purposes of the Act. Accordingly, I would reverse the judgment of the Court of Appeals and remand the case with instructions to enforce the Board's order.