David R. WILLIAMS, Plaintiff-Appellant,

v.

EASTSIDE MENTAL HEALTH CENTER, INC., a corporation, Defendant-Appellee.

No. 81–7284.

United States Court of Appeals, Eleventh Circuit.

March 5, 1982.

Reeves & Still, Edward Still, Birmingham, Ala., for plaintiff-appellant.

Beate Bloch, Associate Sol., Gregory O'Duden, Atty., U. S. Dept. of Labor, Div. of Fair Labor Standards, Washington, D. C., for Secretary of Labor amicus curiae.

Frank O. Hanson, Jr., Birmingham, Ala., for defendant-appellee.

J. Fairley McDonald, III, Asst. Atty. Gen., Ala. Dept. of Mental Health, Montgomery, Ala., for Ala. Dept. of Mental Health amicus curiae.

Before TUTTLE, HILL and JOHNSON, Circuit Judges.

TUTTLE, Circuit Judge:

This appeal involves a suit brought by the plaintiff-appellant against his employer for an award of back pay allegedly owed pursuant to the minimum wage provisions of the Fair Labor Standards Act [FLSA], 29 U.S. C.A. § 206 (1978). The district court, 509 F.Supp. 579, held that under the principles set out in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the defendant-appellee was exempt from the FLSA's minimum wage provisions. For the reasons that follow, we reverse.

I.

The plaintiff David R. Williams was an employee at the Eastside Mental Health Center [Eastside] from February, 1977 until May, 1979. Williams worked in Eastside's Transitional Home Program. This program operates as a type of halfway house, providing psychological rehabilitation services for individuals recently released from state mental hospitals or persons who might otherwise be heading for commitment to a state mental hospital. Eastside hired Williams as a live-in home manager. He was required to work in 96-hour shifts, residing at the home for four days, followed by four days off. Eastside paid Williams a fixed salary, and considered him to be on duty 24 hours per day for the four working days. In fact he was required to be at the home during the four working days only from 5 p. m. until 8 a. m. the following morning.

During the day he was allowed to leave the home if he was not needed. As a home manager Williams' primary function was to oversee and assist the training of residents in basic socialization skills and some routine daily activities.

Sections 206 and 207 of the FLSA require all employers subject to the Act to pay employees a certain minimum wage for the first 40 hours worked in a given week, and one and one-half times the regular wage for any time worked over the 40-hour base. *See* 29 U.S.C.A. §§ 206, 207 (1978). There is some dispute in the record from the court below regarding the number of hours Williams worked during his employment at Eastside. Assuming the facts as alleged by the plaintiff, the losing party in the district court's summary judgment order, the salary Williams received during his entire employment at Eastside was about $27,000 short of the minimum required under the FLSA.

## II.

We must begin by describing the development and character of the defendant-appellee in this case, the Eastside Mental Health Center.[1] The state of Alabama first began treating mental patients in its state hospitals in 1861. Up through the 1960's Alabama provided comprehensive mental health services in state institutions such as Bryce Hospital, Searcy Hospital, and Partlow State School. In addition the state helped fund some smaller community mental health centers.

In 1965 the State Department of Public Health completed a two-year, federally financed study to plan for statewide provision of mental health services. This study recommended the establishment of a network of smaller, but comprehensive mental health centers throughout the state. Subsequently the state passed legislation creating the Department of Mental Health [the Department], *see* Ala.Code § 22–50–1 (1977), and enacted specific legislation to govern the creation and operation of re-gional authorities to administer a network of community mental health centers. *See* Ala.Code § 22–51–1 (1977). All boards and corporations established pursuant to the provisions of this Act are statutorily designated as public corporations. Ala.Code § 22–51–2 (1977). The Department then divided the state into mental health regions, and established mental health authorities under section 22–51–2 to organize and administer the provision of services for each region.

In 1969 the Jefferson-Blount-St. Clair Mental Health Authority [hereinafter "the Authority" or "the Jefferson Authority"] was incorporated as a public corporation under section 22–51–2 as the Authority for coordinating mental health services in the three named counties. The Authority divided its region into four catchment areas each with a population of roughly 185,000 persons, and determined that adequate services could be provided if there were established one comprehensive mental health center in each catchment area. Three such centers were in fact created, one of which was Eastside Mental Health Center, the defendant-appellee in this case. The other two were the Western Mental Health Center and the University Mental Health Center. These latter centers were established as public corporations under section 22–51–2.

Eastside opened its doors as a community mental health center on July 15, 1974. It operated out of a building purchased with state, county and city funds. Unlike its counterpart centers operating within the three-county region, Eastside was initially opened as an unincorporated service unit for the Jefferson Authority wholly owned and operated by the Authority. The Western and University Centers subsequently lodged a complaint that there was a conflict of interest in the Authority operating a center that was competing for funds with

---

1. For reasons that are made clear below, see pp. 676–678 *infra*, the issue of state sovereignty upon which the case turns requires a consideration of the nature of the entity claiming sovereignty, as well as the nature of its chief functions.

the other two centers.[2] In response to this complaint, the Authority then incorporated Eastside as a separate, non-profit entity under the Alabama non-profit statute. *See* Ala.Code § 10–3–1 (1977).[3]

As a non-profit corporation, Eastside is structured similarly to most private, non-profit institutions. Eastside has its own articles of incorporation and set of by-laws. These govern the general structure and management of the center, including appointment of its administrative board of directors. This board is responsible for seeing that adequate funds, staff and equipment are provided for the Center. The board also sets all major policies of the Center. Finally the board selects, hires, and fires the administrative staff of the Center.

Under the by-laws there are 14 separate agencies responsible for appointing the 18 members of Eastside's board of directors. Four directors are appointed by the Jefferson Authority; the other fourteen directors are appointed by a mix of state or public agencies and private, non-profit organizations.[4] The parties in the present controversy stipulated in the district court that 10 of the appointing organizations should be considered as state or public entities and six as private, non-profit groups. The status of the remaining two was to be determined by the district court. The by-laws also provide that the Jefferson Authority must ratify the appointment of all board members, including those appointed by private organizations. There is no indication in the by-laws that any of the appointing agencies or the Jefferson Authority has the power to remove a board member once appointed.

So far as disclosed by the record, all board members are to be motivated solely by what they believe is best for the Center and its clientele. They are not expected to represent or vote for policies favoring their appointing agency. Thus as long as state regulations are not violated, the administration of the institution is not subject to the legal dictates of any "official" state agency or officer.

Eastside's relationship to the Jefferson Authority and to the State of Alabama in general is controlled partially by provisions in the by-laws and articles of incorporation, partially by state licensing standards, and partially by the contracts it maintains with various state agencies for the provision of mental health services to its catchment area. In addition, federal regulations prescribe certain of the Center's activities, as Eastside receives about 38 percent of its funds from the federal government.

All mental health centers in Alabama, including Eastside, are subject to considerable state monitoring. Eastside must comply with the state's Standards for Community Mental Health Centers or be subject to revocation of its certification. Changes in the Center's articles of incorporation or by-laws must be approved by the Jefferson

2. Although the record is not clear on this point, it appears that the Jefferson Authority had some control over the dispersal of state funds to the three mental health centers in its region.

3. The court below determined that Eastside could not be established as a public corporation under section 22–51–2 because the community mental health centers statute allows only one public facility per county, and another center had already filed for incorporation "in the three-county area of Jefferson, Blount and St. Clair." *See* Mem. Op. filed March 24, 1981. Admittedly it is not clear how the statutory maximum had been reached if only one center had applied in a three-county area. Apparently each of the three entities, the Authority, and Western and University Mental Health Centers, had filled the statutory quota for each of the three counties.

4. The Health Departments of Jefferson, Blount, and St. Clair counties appoint one member of the board in rotation; similarly, the three counties' Departments of Pensions and Security, and the three counties' Associations for Retarded Citizens, each appoints one member in rotation. In addition the three County Commissions each appoints a member, the three appointees serving concurrently. Finally, the following agencies and organizations each appoints one board member: the Birmingham City Council, the Council for Exceptional Children, the Baptist Medical Center, the Hill Crest Foundation, Inc., the East End Memorial Hospital Association, the Mental Health Association of Jefferson County, the Occupational Rehabilitation Center, and the Birmingham Regional Health Systems Agency.

Authority. The Authority must also approve the Center's budget. Eastside is subject to auditing by both state and federal officials, and state examiners conduct frequent site visits to inspect its operations. Eastside also participates in Alabama's State Retirement System, and is exempt from state sales taxes. Finally, upon dissolution of the corporation, the articles of incorporation provide that all of Eastside's assets are to vest in the Jefferson Authority.

Eastside's general purpose is to provide comprehensive mental health and mental retardation services to a prescribed geographic area. The Center provides both inpatient and outpatient care, emergency care, consultation and educational services, as well as specialized services for children, elderly persons, and persons with alcohol or drug-related problems. In addition the Center runs the Transitional Home Program for people going to or about to return from a state hospital. The Center assists the local probate court in screening persons for state institutions. Finally, the Center provides some services for adult mentally retarded individuals. Some of these programs involve psychotherapeutic counseling, as well as prescribed medicine treatments. Eastside provides each of the services through contracts with schools, hospitals, nursing homes, or some other state facility or agency.

At present there are 25 community mental health centers in the State of Alabama. Twenty of these Centers are public corporations under Ala.Code § 22–51–2; two are operated directly by local governmental bodies. The remaining three are section 10–3–1 nonprofit corporations such as Eastside Mental Health Center.

### III.

The defendant-appellee Eastside Mental Health Center claims exemption from the minimum wage provisions of the FLSA under the principles set out in the case of *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). Appellee asserts that the *Usery* case re-

quires FLSA exemption for all state or public agencies performing traditional government functions. The appellee argues that because Eastside is so thoroughly allied with the State of Alabama, and furthermore because it is engaged in an ordinarily governmental function, namely, the provision of mental health services to the public, the *Usery* test has been satisfied and exemption is appropriate. We disagree with appellee's understanding of *Usery* and its corollary principles, and for the reasons that follow we hold that Eastside should not be exempt from the FLSA.

The overriding constitutional concern faced by the court in *Usery*, and thus by this Court in the present case, is the problem of affixing a clear and workable boundary between the two sovereignties in our federal system. The problem is amplified as always by the necessity that the result adhere to the facts before us while at the same time serve as a clear guide for future applications. And most importantly we are faced with the task of reaching a determination that is consonant with constitutional precedents.

The existing precedents make clear that the notion of state sovereignty is as important to a truly federal system of government as it is hard to define, let alone pigeonhole into any one constitutional provision. At least since the case of *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 410, 4 L.Ed. 579 (1819), the Court has recognized that state and federal powers must be preserved in a delicate equipoise in a federal system such as we have. The need for this balancing of state and federal power "rests on the conviction that each government, in order that it may administer its affairs within its own sphere, must be left free from undue interference by the other." *Metcalf & Eddy v. Mitchell*, 269 U.S. 514, 523, 46 S.Ct. 172, 174, 70 L.Ed. 384 (1926) (citing *McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316, 4 L.Ed. 579 (1819)). There exist certain constitutional provisions that emphatically, though perhaps ambiguously, address the necessity of protecting the sovereignty and power of the individual state

governments. *See Hans v. Louisiana*, 134 U.S. 1, 21, 10 S.Ct. 504, 509, 33 L.Ed. 842 (1890) (Eleventh Amendment protects states against unconsented suits even if they arise under the Federal Constitution or laws of the United States); *Hodel v. Virginia Surface Min. & Rec. Ass'n*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) (Tenth Amendment contains limits on federal power to regulate states as states).[5]

Resort to specific constitutional provisions, or even individual case precedents, is nevertheless inadequate to a determination of the proper balance to be struck between the state and federal sovereignties. "Experience has shown that there is no formula by which the line may be plotted with precision in advance." *Metcalf & Eddy v. Mitchell*, 269 U.S. at 523, 46 S.Ct. at 174 (1926). Indeed such an approach is apparently inappropriate. In the most recent judicial attempt to determine the appropriate state-federal relationship, the Court in the *Usery* case relied upon a wealth of case precedents involving issues ranging from intergovernmental tax immunity, to federal regulation of commerce, to state control over the location of its state capitol. *See Metcalf & Eddy v. Mitchell*, 269 U.S. 514, 46 S.Ct. 172, 70 L.Ed. 384 (1926); *United States v. California*, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936); *United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941); *Coyle v. Oklahoma*, 221 U.S. 559, 31 S.Ct. 688, 55 L.Ed. 853 (1911). In line with the

*Usery* precedent, we thus feel it appropriate, indeed constitutionally incumbent upon us, to look to a range of case sources interpreting a variety of constitutional provisions and penumbras in determining how to strike the proper balance in the present case.

■ In determining whether a state's sovereignty has been unduly and unconstitutionally impaired by federal regulation, the courts have in the past considered several factors. First, they have looked to the nature of the entity being regulated. In *Usery* the Court acknowledged that attributes of state sovereignty emanating from the federal structure of our government put the states on a different footing from purely private entities with respect to federal regulation of their activities. Citing *Coyle v. Oklahoma*, 221 U.S. 559, 31 S.Ct. 688, 55 L.Ed. 853 (1911), the Court in *Usery* declared that even some affirmative grants of constitutional power to the federal government must be limited when national regulations directly affect a state or its political subdivisions in carrying out normal governmental activities. *National League of Cities v. Usery*, 426 U.S. at 845, 855–56 n.20, 96 S.Ct. at 2471, 2475–76 n.20 (1976).

Of course the determination that a regulation affects a state or its political subdivision is not always a simple one to make. There exist many public or quasi-public agencies the status of which, for purposes of determining a state sovereignty question,

---

**5.** The ambiguity of Tenth Amendment case law is merely coextensive with the ambiguity of its language. *Compare United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941) (Tenth Amendment states but a truism), *with Fry v. United States*, 421 U.S. 542, 547 n.7, 95 S.Ct. 1792, 1795 n.7, 44 L.Ed.2d 363 (1975) (Tenth Amendment declares policy that Congress may not exercise power so as to impair the states' integrity or their ability to function effectively in a federal system), *National League of Cities v. Usery*, 426 U.S. 833, 842, 96 S.Ct. 2465, 2470, 49 L.Ed.2d 245 (1976) (relying on Tenth Amendment case precedents to strike down FLSA as applied to state and municipal governments), *and Hodel v. Virginia Surface Min. & Rec. Ass'n*, 452 U.S. 264, 289, 101 S.Ct. 2352, 2366, 69 L.Ed.2d 1 (1981) (citing Tenth Amendment as embodying certain limits on federal Commerce Clause regulations).

Even Eleventh Amendment jurisprudence suffers from substantial confusion and complexity. For example, the principle of state immunity from unconsented suits has been qualified or at least restricted by a countervailing principle distinguishing suits against a state from suits against an individual officer of the state. The latter type of suits, at least in some circumstances, is not barred by the Eleventh Amendment. *Compare Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (establishing equitable cause of action against state officers in their individual capacities notwithstanding Eleventh Amendment) *with Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (qualifying Ex Parte Young in situations where remedy requires payment of state funds as compensation for past damages).

is not easy to characterize. Frequently the courts have faced similar classification problems when deciding cases in the areas of state action doctrine, see, e.g., Evans v. Abney, 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970), § 1983 litigation, see, e.g., Adickes v. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and Eleventh Amendment sovereign immunity questions, see, e.g., Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).[6]

At issue in Usery was the constitutionality of the Fair Labor Standards Act when applied to wages paid by state and subordinate political subdivisions to their employees. The Court held that this would seriously impair the right of the state to carry out its normal functions. It was only the payment of wages by state or subordinate political bodies that was involved there.[7] The Court in Hodel v. Virginia Surface Min. & Rec. Assn., supra, interpreted Usery as requiring that, inter alia, the federal regulation in question must address the "States as States" in order for there to be an infringement of state sovereignty. Hodel v. Virginia Surface Min. & Rec. Assn., 101 S.Ct. at 2366 (1981).

■ Beyond that we think the relevant inquiry is the extent of control the states maintain over the activities and administration of the entity in question. Indeed it seems to us appropriate to borrow from principles established by the court in NLRB cases involving the issue of whether a particular entity is a political subdivision and is

therefore exempt from the provisions of the National Labor Relations Act, 29 U.S.C.A. § 152(2) (1973). See NLRB v. Natural Gas Utility Dist., 402 U.S. 600, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1971).[8] In NLRB v. Natural Gas, the Court in a close case considered relevant whether the entity seeking exemption was administered by individuals responsible to public officials or to the general electorate. Id. at 605, 91 S.Ct. at 1749–50. Although these cases turn on the construction of the Labor Relations Act and not on constitutional considerations of state sovereignty, we find them helpful in our inquiry, and until the Court holds otherwise we will adopt this approach.

Second, in deciding cases involving possible federal infringement of state sovereignty, the courts have assessed the function of the entity being regulated. In Usery the Court repeatedly emphasized that the FLSA directly affected a function that was traditionally a governmental activity, namely, the structuring of wage and hour policies. National League of Cities v. Usery, 426 U.S. at 845–46, 851–52, 96 S.Ct. at 2471–72, 2474 (1976). The Court alternately characterized this function as traditional, essential, fundamental, and integral. Id. at 845, 851, 96 S.Ct. at 2471, 2474. The Court listed several other functions that could be so characterized, including fire prevention, police protection, sanitation, public health, and parks and recreation. Id. at 851, 96 S.Ct. at 2474. Moreover, in overruling Maryland v. Wirtz, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968), the Court

---

**6.** The Court in neither the Usery nor the Hodel case had to face this issue, as the nature of the regulated entities was not disputed in either case. In Usery many states were party to the suit, and the issue was whether the FLSA as applied directly to the states was within Congress' powers. National League of Cities v. Usery, 426 U.S. at 854, 96 S.Ct. at 2475 (1976). Similarly in Hodel the states were parties, and the Court did not question their status as states, but rather doubted that the states were being directly regulated by the federal government. Hodel v. Virginia Surface Min. & Rec. Assn., 101 S.Ct. at 236 (1981).

**7.** That subordinate bodies are included in the Usery exemption is a principle which derives from explicit language in the opinion, as well as

by implication, at least insofar as the term relates to "such areas as fire protection, police protection, sanitation, public health, and parks and recreation." National League of Cities, supra, 426 U.S. at 851, 96 S.Ct. at 2474. The opinion specifically included "political subdivisions" as entities for which classification of sovereignties is appropriate. Id. at 855, n.20, 96 S.Ct. at 2476, n.20. Additionally, the Court mentioned state schools, hospitals, and other "subordinate arms of state government" as properly labelled sovereigns. Id.

**8.** We base our analogy to the labor cases on the simple fact that the precise term "political subdivision" is used in both the Usery case and the NLRB cases.

implicitly included the operation of public schools and hospitals as traditional functions of the states. 426 U.S. at 855, 96 S.Ct. at 2476. In *Hodel*, the Court listed the traditional nature of the function involved as the second condition precedent to a finding that a state's sovereignty has been constitutionally infringed by federal regulation. *Hodel v. Virginia Surface Min. & Rec. Ass'n*, 101 S.Ct. at 2366 (1981).

The third and final indicium of state sovereignty frequently considered by the courts is the nature of the federal regulation involved. The Court in *Usery* discussed at length the effects on state government operations that would result from application of the FLSA. The Court focused on the significant costs, both in terms of money and in terms of necessary restructuring of employment operations, that states would have to bear if forced to comply with the FLSA. *National League of Cities v. Usery*, 426 U.S. at 846–51, 96 S.Ct. at 2471–74 (1976). Similarly in *Fry v. United States*, the Court cited the unintrusive nature of the Economic Stabilization Act as a primary reason for upholding its application to state employees. *Fry v. United States*, 421 U.S. at 548, 95 S.Ct. at 1796 (1975). Finally, in the intergovernment tax immunity cases, the Court has been guided by an assessment of the interference with state government functioning. *See Helvering v. Gerhardt*, 304 U.S. 405 at 419–20, 58 S.Ct. 969 at 974–75, 82 L.Ed. 1427 (1938).

## IV.

Before applying the foregoing principles to the facts of the case before us, we may well benefit from a quick study of Immanuel Kant's On the Old Saw: That May be Right in Theory but it Won't Work in Practice (E. B. Ashton trans. 1974). Precise legal guidelines easily applicable to particular fact situations do not exist in cases such as this involving broad constitutional concepts such as that of sovereignty. As will become clear shortly, our job is compounded in this case by the borderline nature of the facts before us. Nevertheless we are convinced that upon a consideration of all the factors, on balance it seems clear that Eastside is not and should not be treated as a sovereign entity in our federal system.

■ The determinative fact in this case is simply that the entity with which we are dealing is not a state or a political subdivision of a state as defined by the Court in *Usery* and in other cases involving similar issues. Eastside Mental Health Center is not the State of Alabama, nor is it an agency or department of the State of Alabama. Indeed no party contends otherwise.

Moreover as it currently exists under Alabama state law, Eastside is not a public agency or corporation. As was noted earlier, the Center is incorporated as a non-profit institution under section 10–3–1, rather than as a public corporation under section 22–51–2 of the Alabama Code. The Center is in fact distinct from many of the other community mental health centers operating in the State of Alabama in precisely this regard. For whatever reason, Alabama did not elect to operate Eastside as a state institution with state employees; instead it set up a not for profit corporation with a separate, independent board of directors to administer it. Whatever may have been the state's reason for doing it this way, it must live with the consequences. It cannot claim an immunity based on a condition which it itself sought to avoid.

Here, then, lies the greatest difference between *Usery* and the facts of this case. Here we are concerned with application of the FLSA wages paid by a not for profit corporation which operates by contract with a public corporation of the State of Alabama and by contract with other entities. There is thus no impact on the state in its relation with its own employees. Thus, the FLSA does not affect the "States as States."

For such reasons as were satisfactory to it, the State of Alabama elected not to employ any persons to operate institutions performing such services as are performed by Eastside. By making this election it removed the agency from the protection of the Tenth Amendment as delineated in

*Usery* and *Hodel.* Instead, certain individuals organized a corporation under the general legislative authorization used by other citizens to organize all educational, religious and other eleemosynary institutions, which thereafter contracted with Jefferson, itself an independent corporation, to carry out these functions.

For purposes of the sovereignty issue before us, Eastside is thus best characterized as a private, non-profit corporation, licensed in the State of Alabama to perform the services of a community mental health center, and carrying out such services by means of ordinary contracts with various state and local agencies and institutions. It is thus analogous to a normal nonprofit institution in its basic corporate structure, while at the same time analogous to a private business doing contracting work for the state in its basic business operations.

Although the Center is subject to substantial state regulation, this fact does not change our characterization. With respect to the state licensing regulations, we find it difficult to distinguish Eastside from a variety of private corporations and professional individuals that are subject to similar state control pursuant to licensing statutes. Such controls are normal means by which states effectuate public policies through the regulation of private entities. These licensing controls do not, however, somehow magically transform the fundamental nature of the licensed entity into a public agency or official.

The additional control exerted by the Jefferson Authority over Eastside's budget, board of directors, and residual assets upon dissolution, are not so significant as to justify characterizing the Center as an arm of the state. With respect to the board of directors, not only does the State of Alabama not have control over the appointment of nearly one-half of the board membership, in addition it has no power whatsoever to dismiss any of the board appointments. Members of the board do not serve as representatives of the state or any of its agencies. For this latter reason it is clear that no member of the administrative board is directly responsible to a public official or to the general electorate. Under the test set out in *NLRB v. Natural Gas Utility Dist.*, 402 U.S. 600, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1971), this factor indicates that Eastside is not a political subdivision of the State of Alabama. The other controls, while perhaps uncommon in the context of normal private corporations contracting with the states, must be viewed simply as stringent licensing standards necessary to the effective implementation of the state's police power in the mental health arena.

If the State of Alabama chooses to foster the provision of mental health services by allowing Eastside and similar mental health centers certain fringe benefits, including sales tax exemption and participation in the State Retirement System, this does not mean that Eastside should be viewed as an arm of the state. Alabama either provides or legally may provide similar benefits to entities that are declaredly not public agencies.[9]

Our conclusion that the Eastside Mental Health Center is not a state agency or a political subdivision of the state is sufficient under the *Hodel* test for us to hold that it may not be exempt from the FLSA. Just as in *Hodel*, we need not reach the other factors in the sovereignty test if we initially find, as we do here, that the entity with which we are dealing is not a state. *See Hodel v. Virginia Surface Min. & Rec. Ass'n*, 101 S.Ct. at 2369 (1981). For this reason it is not necessary for us to consider the extent of the FLSA's effect on Eastside's function of granting mental health services, nor need we decide whether such function is traditional or essential. In

---

**9.** The State of Alabama does in fact grant sales tax exemption to many other private businesses. *See* Ala.Code § 40–23–4 (1975). In addition, membership in the State Retirement System is not limited to state agencies, as it is also available to employees of a "public or quasi-public organization." *See* Ala.Code § 36–27–6 (1975). Assuming Eastside is considered a quasi-public organization, it may participate in the retirement system and yet still not be a state or public agency within the meaning of the term as used in the *Usery* case.

view of the significance of the term "integral" used in the *Usery* opinion, however, we think it important to briefly discuss the application of this concept to the facts of this case. In short we believe that even if the State of Alabama had chosen to operate Eastside as a state agency, the Center is not performing an "integral" function and thus the *Usery* exemption would not apply.

In *Usery* the Court used the term "integral" to define the nature of a state operation that is protected by considerations of sovereignty. "We hold that insofar as the challenged amendments [of the FLSA] operate to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions, they are not within the authority granted Congress by Art. 1, § 8, cl. 3." 426 U.S. at 852, 96 S.Ct. at 2474 (1976) (footnotes omitted).[10]

■ Dictionary definitions indicate that the adjective "integral" signifies something that is a part of or is in itself a whole. *See Webster's New International Dictionary* 1290 (1936). We think an integral function is in this context one that a state performs for or in relation to the society at large, the state as a whole. One such function is the state's taxing power; another is the state's function of enacting laws for the public good through its legislative body. For purposes of determining whether a particular function is "integral" in the context of sovereignty decisions such as the one before us, we think it therefore helpful to look at whether the federal regulation in question affects a state function in a way that reverberates throughout the society as a whole.[11] For example, any interference with a state's provision of police protection to its citizenry, or its ability in general to pass laws in its legislature, clearly affects all people in the state. Such integral functions may be contrasted with those that, while perhaps traditional, are nevertheless not functions which relate to the entire state populace. An example of a non-integral function is a state's enactment of particular regulations addressing specific problems such as water usage, farming, railroads, utilities, etc. Even though such functions may have been traditionally carried out by the state, federal regulation thereof is not prohibited because the functions do not produce significant consequences affecting all persons in the state and thus are not, in our definition of the term, "integral" functions.[12]

With these principles in view, we find that Eastside's function of providing mental health services to the citizens of Alabama is

---

**10.** We believe that the term "integral" relates to the nature of the state function to be given sovereign protection. Admittedly the Court in *Usery* appears in the quoted passage to differentiate an "operation" from a "function." It may be said that the phrase "integral operation" refers to the manner in which the state chooses to carry out its traditional function, including the state's structuring of its wage policies for those employees carrying out such functions. Here the term "integral" would refer both to the fact that the setting of wage policies is *crucial* to the state's ability to carry out effectively a particular function, and to the fact that such policies affect the *whole* of the state's operations, in this case, all employees of the state. Under this view, it is of course true that any case such as the one before us involving the application of the FLSA to what is arguably a state entity involves an interference with the state's ability to structure its *integral* operations. In our opinion, however, the term "integral" also applies to the type of governmental function that is to be protected under a concept of state sovereignty.

At least one commentator agrees that the term "integral" is used in *Usery* to modify the type of state function involved. *See* Note, Taking Federalism Seriously: Limiting State Acceptance of National Grants, 90 Yale L.J. 1694, 1708 (1981). *See also, National League of Cities v. Usery*, 426 U.S. at 851, 855, 96 S.Ct. at 2476, (using phrase "integral governmental functions").

**11.** It bears noting that in this respect a determination of whether a function is integral requires an assessment of the effect of the federal regulation, which is in fact the third factor which the courts have considered in making sovereignty determinations. *See* pp. 678–679 *supra.*

**12.** Under our test regarding integral functions, the Court in *Hodel* could have easily found that the function of regulating the mining industry, while perhaps traditional, as the state parties argued, was nevertheless nonintegral because the federal interference did not affect the entire state citizenry.

not an integral function as we have interpreted the term. The function involved here addresses a specific problem affecting a limited class of persons within the state. Any effect the FLSA will have if applied to Eastside is not one that is so extensive that it will be felt by the entire citizenry of Alabama.

REVERSED.

JAMES C. HILL, Circuit Judge, specially concurring:

I concur in the judgment reversing this case.

The majority opinion observes:

"For whatever reason, Alabama did not elect to operate Eastside as a state institution with state employees; instead it set up a not for profit corporation with a separate, independent board of directors to administer it. Whatever may have been the state's reason for doing it this way, it must live with the consequences. It cannot claim an immunity based on a condition which it itself sought to avoid."

Additional language expands upon and explains this reason for our judgment, and I join in the opinion to that extent.

Insofar as the opinion reaches conclusions based upon the hypothetical ("In short we believe that even if the State of Alabama had chosen to operate Eastside as a state agency, . . . ."), I am not willing to join. Were it necessary to express a conclusion, I am presently inclined to the view that such an operation would be exempt.