**SKILLS DEVELOPMENT SERVICES, INC., et al., Plaintiffs-Appellants,**

v.

**Raymond J. DONOVAN, Secretary of Labor, et al., Defendants-Appellees.**

No. 82–5533.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 10, 1984.
Decided Feb. 20, 1984.

---

Richard P. Lasko, King, Ballow & White, Gerald A. Smith, argued, Barnett & Alagia, Nashville, Tenn., for plaintiffs-appellants.

William M. Cohen, Asst. U.S. Atty., Nashville, Tenn., Mark C. Rutzick, Shalom Brilliant, argued, Dept. of Justice, Washington, D.C., T. Timothy Ryan, Jr., Ruth Peters and Douglas White, U.S. Dept. of Labor, Washington, D.C., Ralph D. York, U.S. Dept. of Labor, Nashville, Tenn., for defendants-appellees.

Before KENNEDY, MARTIN and CONTIE, Circuit Judges.

CORNELIA G. KENNEDY, Circuit Judge.

Plaintiffs, private corporations providing services to the mentally retarded under contracts with the State of Tennessee, appeal the judgment of the District Court that they are subject to the minimum wage and overtime provisions of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 et seq. The plaintiffs contend that such regulation violates the tenth amendment under *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). The District Court found that the plaintiffs, as private entities, do not fall within the tenth amendment's protection of the states. *Skills Development Services, Inc. v. Donovan*, 558 F.Supp. 164 (M.D.Tenn.1982). We affirm.

Tennessee has offered services specifically for the mentally retarded since 1923, when the Tennessee Home for the Feeble-Minded opened. In the 1950s the state established a Department of Mental Health and Mental Retardation, which now operates three state institutions for the mentally retarded. Tennessee also has provided services outside state institutions. The state began training mentally retarded children in a private hospital in 1945, and in public schools in 1955; in the 1960s, vocational training centers for the mentally retarded were developed by a private association and taken over by the state. In the mid-1960s Tennessee began exploring other ways to provide services to the mentally retarded. A series of studies and reports recommended the use of community-based programs implemented by private non-profit corporations, and in 1973 the state adopted a formal plan of encouraging the development of such corporations.

The plaintiffs, Skills Development Services, Inc. (Skills), Hardeman County Developmental Service Center (Hardeman), and Michael Dunn Center, Inc. (Dunn) (collectively "the Contractors"), are private non-profit corporations which provide services to the mentally retarded in their community. All of the Contractors named as plaintiffs in this case were incorporated before the 1973 plan was ratified by the state: Dunn's predecessor in 1971, Hardeman in 1970, and Skills' predecessor in 1962.

Each Contractor is a party to one or more written contracts with the Department of Mental Health and Mental Retardation. Under these contracts, the Contractors receive funds from the state for providing residential and habilitative service or both.[1] These contracts impose detailed requirements on the operations and procedures of the Contractors. The state reviews the Contractors' budgets and requires certain financial record keeping. The contracts require that the Contractors' employees meet the minimum standards for comparable employment in state government, and that state authorities approve every person hired as a program director. Under the contracts, state funds may be used to pay only salaries and fringe benefits of staff members consistent with the levels and policies established for state employees, and staff members must work the same minimum number of hours per week as state employees. The contracts also control, in a precise and detailed way, what, how and to whom services must be provided, and provide extensive state monitoring.

However, the Contractors are not prohibited from providing services independent of the contracts, although no Contractor does. The state may not appoint or discharge the Contractors' directors, hire or fire employees, or direct day-to-day operations. The contracts cover a limited time period, and can be terminated by either party upon advance written notice. Moreover, the contracts state that each Contractor is an "independent contractor and not an employee of the State of Tennessee or a state agency," that each Contractor must pay public liability insurance and taxes, and that

---

1. The Contractors also receive federal and state matching funds under Title XX of the Social Security Act, 42 U.S.C. § 1397 et seq., and various private funds.

"[t]he State has no liability except as specifically provided for in this Grant."

In 1980, a Compliance Officer of the U.S. Department of Labor audited Skills and discovered several apparent violations of the FLSA, including underpayment of minimum wages and overtime compensation. A Department of Labor audit performed in early 1981 revealed similar apparent violations by Hardeman. Skills and Hardeman requested additional funds from the State of Tennessee to comply with the FLSA; the state refused, and Hardeman informed the Department of Mental Health and Mental Retardation that it intended to cancel its contract if required to comply with the FLSA.

In the present case, the Contractors are seeking a declaratory judgment that applying the minimum wage and overtime provisions of the FLSA to them, as private corporations acting pursuant to contracts with the State of Tennessee, violates the tenth amendment of the United States Constitution. This suit also seeks preliminary and permanent injunctive relief. The Department of Labor has counterclaimed against Skills and Hardeman, seeking to enjoin them from violating the FLSA and from withholding unpaid minimum wages and overtime compensation; consideration of this counterclaim was deferred by the District Court. The parties filed cross-motions for summary judgment, and the District Court found the Contractors' tenth amendment claim without merit and dismissed their action. We agree that FLSA regulation of the Contractors does not violate the tenth amendment's protection of state sovereignty.

The Supreme Court in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), held that the tenth amendment places some limits on Congress' power to regulate the states under the commerce clause. In holding that FLSA provisions requiring minimum wage and overtime compensation could not constitutionally be applied to certain state employees, the Court distinguished Congress' plenary authority to regulate "individual

businesses" from "a similar exercise of congressional authority directed, not to private citizens, but to the States as States." *Id.* at 845, 96 S.Ct. at 2471. The imperative of state sovereignty as protected by the tenth amendment prohibits Congress from enacting under the commerce clause regulations which "directly displace the States' freedom to structure integral operations in areas of traditional governmental functions." *Id.* at 852, 96 S.Ct. at 2474.

In *Hodel v. Virginia Surface Mining & Reclamation Association*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), the Supreme Court set forth a test for violations of the tenth amendment under *National League of Cities:*

> [I]n order to succeed, a claim that congressional commerce power legislation is invalid under the reasoning of *National League of Cities* must satisfy *each* of three requirements. First, there must be a showing that the challenged statute regulates the "States as States." [426 U.S.] at 854 [96 S.Ct. at 2475]. Second, the federal regulation must address matters that are indisputably "attribute[s] of state sovereignty." *Id.,* at 845 [96 S.Ct. at 2471]. And third, it must be apparent that the States' compliance with the federal law would directly impair their ability "to structure integral operations in areas of traditional government functions." *Id.,* at 852, [96 S.Ct. at 2474.]

452 U.S. at 287–88, 101 S.Ct. at 2365–66 (emphasis in original). A footnote to this passage adds that, even if legislation satisfies all three requirements, it is not necessarily unconstitutional; in some situations "the nature of the federal interest advanced may be such that it justifies state submission." *Id.* at 288 n. 29, 101 S.Ct. at 2366 n. 29.

Since *Hodel,* the Supreme Court has employed this three-pronged test in tenth amendment challenges, *see Equal Employment Opportunity Commission v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983) (extension of Age Discrimination in Employment Act to state game wardens not violative of tenth amendment); *United*

Transportation Union v. Long Island Rail Road Co., 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982) (application of Railway Labor Act to state-owned railroad not violative of tenth amendment). The Sixth Circuit also has used the *Hodel* test for "criteria whether federal action was unconstitutional under *National League of Cities*," *Dove v. Chattanooga Area Regional Transportation Authority,* 701 F.2d 50, 52 (6th Cir.1983) (extension of FLSA to employees of municipal transit system not violative of tenth amendment); *see United States v. Thompson,* 685 F.2d 993, 1001 (6th Cir.), *cert. denied,* 459 U.S. 1072, 103 S.Ct. 494, 74 L.Ed.2d 635 (1982) (naming Office of Governor as RICO enterprise not violative of tenth amendment).

■ In the instant case, the Contractors have failed to satisfy the first prong of the *Hodel* test; applying the FLSA to private corporations doing business with the state, like the Contractors, does not regulate the "States as States." This first part of the *Hodel* test has not been extensively litigated, and in the four tenth amendment cases recently decided by the Supreme Court— *National League of Cities, Hodel, Long Island Rail Road,* and *EEOC v. Wyoming* —the state character of the regulated entity was not disputed.[2] Two courts of appeals, however, have relied on the "States

as States" test to find no tenth amendment violation in fact situations very similar to the present case.

In *Richland County Association for Retarded Citizens v. Marshall,* 660 F.2d 388 (9th Cir.1981), *vacated on other grounds,* 454 U.S. 389, 102 S.Ct. 713, 70 L.Ed.2d 570 (1982),[3] a private corporation which operated a residential home for the mentally retarded under contract with the State of Montana sought protection under the tenth amendment from the minimum wage and maximum hour provisions of the FLSA. The Ninth Circuit found the FLSA constitutionally applicable to a private entity like the plaintiff corporation because "the requirement that the regulation operate on a state as a state is not met." *Id.* at 391, 102 S.Ct. at 714.

The Eleventh Circuit came to the same conclusion in *Williams v. Eastside Mental Health Center, Inc.,* 669 F.2d 671 (11th Cir.), *cert. denied,* 459 U.S. 976, 103 S.Ct. 318, 74 L.Ed.2d 294 (1982), in which an employee of a private non-profit corporation sued for back pay under the minimum wage provisions of the FLSA. The defendant corporation, a community mental health center operating in Alabama, argued that because it provided services under stringent state contracts and regulation the FLSA could not

**2.** The holding in *Hodel* that the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1201 *et seq.,* did not violate the tenth amendment was based on a failure to satisfy the "States as States" requirement. The character of the entities involved, however, was not disputed. The Court observed that the challenged steep-slope provisions of the Act "govern only the activities of coal mine operators who are private individuals and businesses," and did not directly regulate states as states. 452 U.S. at 288, 101 S.Ct. at 2366. Most of the Court's analysis considered whether, by preempting state regulation of business, the Act regulated the states themselves; the Court concluded that Congress may use its powers under the commerce clause to displace state regulation of private activity. *Id.* at 290, 101 S.Ct. at 2367.

**3.** In *Richland,* the District Court held that application of the FLSA to the plaintiff corporation was unconstitutional under the tenth amendment. On appeal, the Court of Appeals originally affirmed and a notice of appeal to the

Supreme Court was filed. After the appeal was filed, the Supreme Court decided *Hodel.* The Court of Appeals then *sua sponte* recalled its earlier opinion and entered the above-cited judgment reversing the district court on October 9, 1981.

On January 11, 1981, the Supreme Court vacated both decisions of the Court of Appeals. First, because appellants could have filed a direct appeal from the District Court to the Supreme Court under 28 U.S.C. § 1252, the Court of Appeals was deprived of jurisdiction under 28 U.S.C. § 1291 to hear an appeal. Moreover, the Court of Appeals had no jurisdiction to recall its opinion and issue a second decision *sua sponte* after the notice of appeal to the Supreme Court was filed. Accordingly, the judgments were vacated, and the appeal was dismissed because the statute of limitations for an appeal, 28 U.S.C. § 2101(a), had expired. We cite *Richland,* not for its precedential value, but for the logic of its application of the *Hodel* test to a fact situation similar to the present case.

be constitutionally applied to it. The court rejected this contention noting, "The determinative fact in this case is simply that the entity with which we are dealing is not a state or a political subdivision of a state." *Id.* at 678. Because requiring the defendant mental health center to comply with the FLSA would have no impact on the relationship between the State of Alabama and its employees, the court concluded, "The FLSA does not affect the 'States as States'." *Id.* Recognizing that Alabama could have provided mental health services through its own employees, the court found the state's choice to use private contractors crucial:

> For such reasons as were satisfactory to it, the State of Alabama elected not to employ any persons to operate institutions performing such services as are performed by Eastside. By making this election it removed the agency from the protection of the Tenth Amendment as delineated in [*National League of Cities*] and *Hodel.*

*Id.* at 678–79.

The facts of *Richland* and *Williams* are very similar to the present case.[4] The court below expressly adopted the reasoning of *Williams* and held, "Whatever nuances might be superimposed upon the relationship between these plaintiffs and the state, application of the Act to them does not represent regulation by federal authorities of the 'States as States'." *Skills Development Services, Inc. v. Donovan,* 558 F.Supp. 164, 164 (M.D.Tenn.1982). Like Alabama,

Tennessee chose to delegate certain tasks by contract to private corporations, and, the District Court concluded, " '[w]hatever may have been the state's reason for doing it this way, it must live with the consequences'." *Id.* at 165, quoting *Williams,* 669 F.2d at 678. Moreover, the District Court added that even if private corporations could gain state status for tenth amendment purposes by contract, such was not the intent of the parties in this case, where the plaintiffs' contracts with the state clearly designated them as independent contractors, not state agencies. *Id.* at 165.

We agree with the reasoning of all these opinions. The Contractors are protected from the FLSA by the tenth amendment only if imposing the Act's requirements on the Contractors would regulate the "States as States." It is evident, however, that regulating the Contractors would not regulate a state, state agency, or political subdivision of a state. The Contractors are clearly not states, and the contracts that create their relationship with the state show that the parties did not intend that the Contractors be considered state agencies.

■ It is equally apparent that the Contractors are not political subdivisions of the State of Tennessee. In *Williams,* the Eleventh Circuit employed for tenth amendment analysis the test for a "political subdivision" used by the National Labor Relations Board (NLRB) to determine exemptions from its jurisdiction.[5] The NLRB definition, used in

---

4. The corporation in *Richland* apparently had somewhat more autonomy over its operations than the Contractors in the present case; according to its contract with the State of Montana, the private corporation retained control over the "methods, times, means and personnel" for providing services, *see* 660 F.2d at 390. On the other hand, the mental health center in *Williams* was more closely involved with state agencies than the Contractors: at least ten state agencies participated in selecting some members of the board of directors, employees participated in the State Retirement System, and the contractor was exempt from state sales tax, *see* 669 F.2d at 674–75. In both cases, however, applying the FLSA was held not to constitute regulating the "State as States,"

5. The court in *Williams* reasoned that analogy to these labor cases was appropriate because "the precise term 'political subdivision' is used in both the [*National League of Cities*] case and the NLRB cases." 669 F.2d at 677 n. 8. An even stronger link is suggested by the Sixth Circuit's statement, "As we understand it, the rationale for the 'political subdivision' exemption has its ultimate basis in the Tenth Amendment consideration of state sovereignty and the Eleventh Amendment grant of judicial immunity to the states." *Crestline Memorial Hospital Association, Inc. v. NLRB,* 668 F.2d 243, 245 n. 1 (6th Cir.1982) (hospital operating as a private non-profit corporation not a political subdivision). These tenth amendment considerations make the NLRB test relevant here.

*Williams,* poses two tests: the entity must be either created by the State to constitute a department or administrative arm of the government or administered by individuals who are responsible to public officials or the general public. *See Crestline Memorial Hospital Association, Inc. v. NLRB,* 668 F.2d 243 (6th Cir.1982). The Contractors do not meet either test. Although state officials doubtless encouraged the organization of private groups such as the Contractors, private citizens apparently created these associations, before 1973 when the state formally adopted a plan to use private groups to provide services to the mentally retarded. Moreover, the administrators of the Contractors are not responsible to public officials or the general electorate, who cannot fire nor recall the administrators. Courts employing this element of the political subdivision test look for an ability by public officials or the general public to remove an offending administrator. *See, e.g., NLRB v. Natural Gas Utility District of Hawkins,* 402 U.S. 600, 604–7, 91 S.Ct. 1746, 1749–50, 29 L.Ed.2d 206 (1971); *Truman Medical Center, Inc. v. NLRB,* 641 F.2d 570, 573 (8th Cir.1981); *NLRB v. Natchez Trace Electric Power Association,* 476 F.2d 1042, 1045 (5th Cir.1973). In the instant case, both parties to the contracts do retain a right to terminate the contract at any time. However, the state does not have the sort of internal control that an ability to discipline or fire administrators demonstrates simply because it may terminate its relationship with an unsatisfactory contractor. For example, in *NLRB v. St. Louis Comprehensive Neighborhood Health Center, Inc.,* 633 F.2d 1268 (8th Cir.1980), *cert. denied,* 454 U.S. 819, 102 S.Ct. 99, 70 L.Ed.2d 89 (1981), a private non-profit corporation that provided health services was deemed not a political subdivision, despite receiving its funding through federal grants. Although the federal government apparently could refuse to renew the corporation's funding and so probably had great influence, the court concluded that "board members [do not] serve at the pleasure of public officials or the general electorate." *Id.* at 1270 n. 3. Similarly, the Contractors' administrators cannot be said to be responsible to the public or public officials.

■ The Contractors attempt to avoid the conclusion that since they do not qualify as states, state agencies, or political subdivisions they cannot satisfy *Hodel* by vigorously arguing that they are protected by the tenth amendment as captive instrumentalities of or joint employers with the state. In support of this "captive instrumentalities" doctrine, however, the Contractors cite cases in which entities intimately connected with the *federal* government claimed immunity from *state* tax, *see, e.g., United States v. New Mexico,* 455 U.S. 720, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982); *First Agriculture National Bank v. State Tax Commission,* 392 U.S. 339, 88 S.Ct. 2173, 20 L.Ed.2d 1138 (1968); *United States v. Boyd,* 378 U.S. 39, 84 S.Ct. 1518, 12 L.Ed.2d 713 (1964). The doctrine is thus inapposite to the tenth amendment's protection of state sovereignty against federal incursions: "The considerations bearing upon taxation by the States of activities or agencies of the federal government are not correlative with the considerations bearing upon federal taxation of State agencies or activities." *New York v. United States,* 326 U.S. 572, 577, 66 S.Ct. 310, 312, 90 L.Ed.2d 326 (1946). Since intergovernmental immunity is not reciprocal, *id.,* cases based on federal immunity to state regulation are irrelevant to the present case.

■ The Contractors' argument that they are joint employers with the state is equally irrelevant to tenth amendment analysis. Under Department of Labor regulations, a worker may be jointly employed by two entities, each of which is responsible for complying with the FLSA. 29 C.F.R. § 791.2 (1983). The Contractors contend that they are joint employers with the State of Tennessee, and according to the Contractors' reasoning, if the state cannot be compelled to comply with the FLSA, neither can the Contractors, as joint employer. In this case, however, the Department of Labor has requested compliance only from the Contractors. The joint employer rule could be challenged under the

tenth amendment only where an employer did not comply with the FLSA, and the joint employer rule was used to compel the state to provide additional compensation. For example, in *Bonnette v. California Health and Welfare Agency,* 704 F.2d 1465 (9th Cir.1983), chore workers employed in private homes under California's supportive services plan brought suit against state agencies, alleging violations of the FLSA. Finding that the state was a joint employer, the court analyzed the extension of the FLSA to the state by the joint employer rule under the tenth amendment. In the instant case, however, no one has invoked the joint employer rule to involve the State of Tennessee. Accordingly, even assuming *arguendo* that the state is a joint employer with the Contractors, the joint employer rule has no relevance to this case.

In presenting their claim for tenth amendment protection, the Contractors essentially err in asserting that effects of regulation are the sole and ultimate measure of constitutionality; the tenth amendment prohibits application of the FLSA to the Contractors, they contend, because it would allegedly interfere with their provision of "state" services under contract. This "effects test," in fact, collapses the first two requirements set forth in *Hodel* into the third—"that the States' compliance with the federal law would directly impair their ability to structure integral operations in areas of traditional governmental functions," 452 U.S. at 288, 101 S.Ct. at 2366. *Hodel* clearly states, however, that each of the requirements must be satisfied. *Id.* at 287, 101 S.Ct. at 2365. In this case, requiring the Contractors to comply with the FLSA does not regulate the "States as States," and so does not satisfy the first prong of the *Hodel* test.

Because we hold that regulating the Contractors does not regulate states, we need not reach the other factors in the *Hodel* test. For the reasons stated above, we affirm the judgment of the District Court.