Mario **MINEO**

v.

**TRANSPORTATION MANAGEMENT OF TENNESSEE, INC., et al.**

No. 3–86–0106.

United States District Court, M.D. Tennessee, Nashville Division.

March 21, 1988.

John W. Beasley, Nashville, Tenn., for plaintiff.

Earl W. Roberts, Legal Dept. of Metropolitan Government of Nashville, Nashville, Tenn., for defendants.

## MEMORANDUM

JOHN T. NIXON, District Judge.

Pending before the Court is the motion for summary judgment filed by defendants Transportation Management of Tennessee, Inc. (hereinafter "TMT"), Metropolitan Transit Authority of Nashville and Davidson County, Tennessee (hereinafter "MTA"), and Richard H. Fulton, Mayor of the Metropolitan Government of Nashville and Davidson County, Tennessee. The Court, having reviewed the pleadings submitted by the parties, and for the reasons stated herein, GRANTS the motion.

## I. FACTS

Defendant MTA was created by Appendix Four of the Charter of the Metropolitan Government of Nashville and Davidson County. This provision provides:

1. (a) There is hereby created and established an agency of the metropolitan government to be known as the metropolitan transit authority.

. . . .

14. (c) The entire and complete supervision, regulation, jurisdiction and control over street railway companies operated within the metropolitan government area, shall be vested solely in and exercised solely by the transit authority. With reference to public transit systems, all power and authority heretofore delegated to or vested in the City of Nashville or the metropolitan government and all duties placed upon the metropolitan government, either by its Charter, or by Private Act or by general law, are hereby transferred to and vested in the transit authority. Neither the metropolitan mayor, the metropolitan council, nor any other officer or agency of the metropolitan government shall have or exercise any authority whatsoever over such street railway companies or over the transit authority.

Thus, the MTA was established as a governmental agency distinct from and not controlled in any way by the mayor or council of the City of Nashville.

MTA contracted with ATE Management & Services Company (hereinafter "ATE"), an Ohio corporation that manages inner-city bus companies in several states, to provide management personnel and services for the operation of MTA's mass transit system (hereinafter the "Management Agreement"). ATE, in turn, assigned all of its rights and obligations under the Management Agreement to defendant TMT, a wholly owned subsidiary of ATE, the sole function of which was to manage and operate Nashville's transit system. TMT handled the day-to-day management, including the employment of drivers, of Nashville's transit system at all times germaine to this lawsuit.

Defendant Mayor Richard H. Fulton, concerned about the possibility of injury that might occur if a person suffering from heart problems drove an MTA bus, and notwithstanding the express language of paragraph 14(c) in the Charter, issued Executive Order No. 23 on March 14, 1978. This Order provides:

With this Executive Order, I hereby direct that all employees who have recovered satisfactorily from coronary artery bypass surgery or who have a current clinical diagnosis of *myocardial infarction,* angina pectoris, coronary insufficiency, thrombosis, or any other cardiovascular disease of a variety known to be accompanied by syncope, dyspnea, collapse, or congestive cardiac failure are authorized to drive Metropolitan vehicles, other than:

. . . .

(2) Vehicles providing public transportation or carrying passengers for hire, including but not limited to, Metropolitan Board of Education school buses, *Metropolitan Transit Authority buses,* and vehicles furnishing recreational transportation.

(Emphasis added). The United States Department of Transportation also has adopted regulations concerning health qualifications of bus drivers, but they are less absolute. Title 49 C.F.R. § 391.41(b) provides: "A person is physically qualified to drive a motor vehicle if that person ... [h]as no *current* clinical diagnosis of myocardial infarction." (emphasis added).

Plaintiff Mario Mineo, in October of 1982, was employed by TMT as a bus driver. While off duty on October 9, 1982, Mineo suffered a myocardial infarction (i.e., a heart attack) that resulted in his being hospitalized for nine days. Upon his release, Mineo sought reinstatement to his position as bus driver. Despite assurances from Mineo's doctor, James P. Gregory, that Mineo was not likely to have another attack, TMT refused Mineo's request on the ground that all bus drivers were required to be medically qualified under the standards set forth in the Department of Transportation regulations and Executive

Order No. 23. Thus, although TMT was not bound by the terms of Executive Order No. 23 under the Management Agreement, it adopted the standards contained therein and relied upon them in denying plaintiff reinstatement.

Plaintiff challenged this decision by seeking opinions, in addition to that already obtained from his own physician, from three other physicians. These consulting physicians all concurred with TMT that under the Department of Transportation regulations and/or Executive Order No. 23, Mineo was not qualified to drive a bus. None of the consulting physicians, however, questioned the validity of the assumption underlying Executive Order No. 23 that an individual who suffers a myocardial infarction, no matter how mild the attack, or how fully the individual recovers, necessarily is unfit to drive a bus. Only Dr. Gregory, plaintiff's treating physician, asserted that Mineo was as safe a driver, if not safer, than before the attack. In his affidavit, Dr. Gregory states:

4. Heart attacks, the need for artery by-pass surgery, and cardiovascular problems in general are a result of the aging process. As a natural result of that, heart attack victims and individuals in need of artery by-pass surgery are most often those individuals over the age of forty (40) years. While one does occasionally see these these problems in individuals under forty (40) years of age, that is the exception rather than the rule.

5. The recovery of individuals from artery by-pass surgery and from heart attacks depends on many factors including the person's age at the time of the heart attack or the surgery, the severity of the heart attack or the general condition of his or her cardiovascular system, and other medical problems with which the individual may be afflicted, to name only a few. In short, the question of whether or not a particular individual will make a full recovery has no general answer and is dependent on the individual's situation. On one end of the spectrum is the person whose heart attack is fatal or whose attempted by-pass surgery is totally unsuccessful and ends in death. On the other end are those individuals who make a full and complete recovery with little or no limitation on their actions.

6. A regulation within a governmental entity or a private corporation, for that matter, which prevents anyone who has had a heart attack from engaging in a job involving driving a motor vehicle, whether that motor vehicle is a private motor vehicle, an emergency vehicle or a vehicle involving the mass transportation of the public is arbitrary and capricious and very unfair in its effect in that it fails to take into account the individual factors in each particular case and to recognize that heart attacks, for example, may be relatively minor and recovery may very well be from a practical standpoint nearly total.

7. To enforce a regulation as described in 6., *supra*, against a group of bus drivers employed by a governmental or corporate entity would medically have the effect of discriminating against those bus drivers over the age of forty (40) years in that they would be much more prone to heart attacks and, therefore, more liable to be forced out of their jobs as bus drivers, or into early retirement, or to take different jobs with the governmental entity or company which might pay less money regardless of the extent of their recovery.

8. In the specific case of Mr. Mineo, his heart attack in late 1982 which led to his being refused reinstatement as a bus driver with the Metropolitan Transit Authority of Nashville and Davidson County was of the most minor nature which one could experience, and his recovery was complete as of mid-December, 1982. As I stated in my letter of December 14, 1982, to Mr. Ben Purnell, Director of Transportation of M.T.A.:

Mr. Mineo is a safer bus driver now than he was before he had his myocardial infarction because his arteriograms have indicated to us that a repeat myocardial infarction is impossible. That same cannot be said for all patients with myocardial infarctions nor can it be said for patients with

myocardial infarctions who have not had arteriograms.

To refuse to reinstate Mr. Mineo at that time based on a regulation which, as interpreted by MTA (as an arm of the Metropolitan Government of Nashville and Davidson County), or those acting on its behalf, prevents reinstatement solely on the basis that he had had a heart attack, without looking at the other factors concerning his case, was from a medical standpoint arbitrary, capricious and very unfair to him.

TMT refused to reverse its earlier decision, and Mineo filed a grievance against it under a labor agreement between the Amalgamated Transit Union, Local 1235, and TMT. The grievance proceeded to arbitration, and the arbitration board determined that plaintiff had demonstrated that he had sufficiently recovered to resume work as of October 12, 1984, but not before. Thus, plaintiff was reinstated to his position as a bus driver, but was denied an award of back pay for the almost two years between his hospitalization and reinstatement.

## II. CONCLUSIONS OF LAW

In this lawsuit, plaintiff asserts that defendants' actions violated two federal statutes: (1) the Civil Rights Act of 1871, 42 U.S.C. § 1983; and (2) the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* Defendants have moved for summary judgment as to both of these claims. Before addressing each of these claims separately, the Court first articulates the appropriate standard for reviewing a motion for summary judgment.

## A. STANDARD FOR REVIEWING MOTION FOR SUMMARY JUDGMENT

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 2512, 91 L.Ed.2d 202 (1986), the United States Supreme Court explained the district court's function in ruling upon a motion for summary judgment:

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.

As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

\* \* \* \* \* \*

More important for present purposes, summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

\* \* \* \* \* \*

Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The Judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the

evidence that the plaintiff is entitled to a verdict—"whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."

(Citations omitted). The Supreme Court then concluded "that the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Id.* 106 S.Ct. at 2514. Moreover, the party that opposes the motion has the burden to come forth with requisite proof to support its legal claim, particularly where the opposing party has had an opportunity to conduct discovery. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

It is likewise true that "[i]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. [citation omitted]. It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute....' " *Bohn Aluminum & Brass Corp. v. Storm King Corp.,* 303 F.2d 425, 427 (6th Cir. 1962).

> Summary judgment may only be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P. All facts and inferences to be drawn therefrom must be read in the light most favorable to the party opposing the motion. *Smith v. Hudson,* 600 F.2d 60, 63 (6th Cir.), *cert. denied,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979).

*Duchon v. Cajon Company,* 791 F.2d 43, 46 (6th Cir.1986).

## B. CIVIL RIGHTS CLAIM

Plaintiff alleges that defendants' actions constituted a violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983. This statute provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

Thus, to prove his claim, plaintiff must establish three elements: (1) that defendants performed acts that operated to deprive plaintiff of one or more of his federal constitutional or statutory rights; (2) that defendants acted under the color of the authority of the State of Tennessee; and (3) that defendants' acts were the proximate cause of damages sustained by plaintiff.

Defendants, in their motion for summary judgment, assert that there is no genuine issue of material fact as to the second element; i.e., they contend that they did not act under color of state law. On this basis, they conclude that summary judgment in their favor is appropriate.

For cases brought under 42 U.S.C. § 1983, "under color of law" is analogous to the "state action" requirement for actions brought against a state under the Fourteenth Amendment to the Constitution. *United States v. Price,* 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1156–1157 n. 7, 16 L.Ed.2d 267 (1966). The "Fourteenth Amendment, which prohibits the states from denying federal constitutional rights and which guaranties due process, applies to acts of the states, not to acts of private persons or entities." *Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764,

2769–2770, 73 L.Ed.2d 418 (1982). The Fourteenth Amendment and 42 U.S.C. § 1983 erect "no shield against merely private conduct however discriminatory or wrongful." *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed.2d 1161 (1948). Thus, the Court must consider whether defendants' actions are "fairly attributable to the state." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982).

In the instant case, the crucial question is whether TMT's refusal to reinstate plaintiff to his former position as a bus driver following a heart attack constituted state action. If the actions of TMT do not constitute state action, the Court's inquiry ceases. *Rendell–Baker*, 457 U.S. at 839, 102 S.Ct. at 2770; *Crowder v. Conlan*, 740 F.2d 447, 449 (6th Cir.1984). The Court must carefully sift through the facts and weigh the various circumstances particular to this case to distinguish between the presence of governmental power and mere tangential government participation. *Burton v. Wilmington Park Authority*, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).

In two recent cases, the Supreme Court has thoroughly discussed the state action requirement in cases involving government-regulated, publicly-funded private entities that perform public services. In *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), the Court considered whether a physician's decision to transfer nursing home patients to less expensive facilities constituted state action. The nursing home for which the physicians worked received significant monetary support from the state and was subject to extensive state regulations, although such regulations involving the transfer of patients was indirect. The Supreme Court considered the combined presence of these two factors and determined that no state action occurred. It held that absent evidence of "coercive power ... or ... significant encouragement, either overt or covert," the mere presence of governmental regulation and public funding does not elevate a private entity's acts to the level of state action. *Id.* at 1004, 102 S.Ct. at 2785–

2786. *See Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

In a companion case, *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), the Court considered whether a private school's decision to discharge a vocational counselor constituted state action. The school had a contract with the State Drug Rehabilitation Division and was referred to by the Boston School Committee as a contractor. Although the school was heavily regulated by the state and almost entirely funded through state monies, the Court determined that the school's decision was in no way "compelled or even influenced by any state regulation." *Id.* at 841, 102 S.Ct. at 2771. The Court further held that the government agency's power to regulate the hiring of the vocational counselor was insufficient to raise the "decision to discharge, made by private management, [to] state action." *Id.* at 842, 102 S.Ct. at 2772. Likening the school to a private contractor, the Court stated, "Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." *Id.* at 841, 102 S.Ct. at 2771. The Court also rejected the argument that the school was performing a public function and stated that unless a function "traditionally [has been] the exclusive prerogative of the State," the performance of that function, while serving the public, does not constitute state action. *Id.* at 841, 102 S.Ct. at 2771. Finally, the Court rejected the argument that state action existed because there was a "symbiotic relationship" between the state and the school. *See Burton v. Wilmington Park Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (state action found because the state, in profiting from a restaurant's discriminatory actions, had a symbiotic relationship

with the restaurant). The Court held that the school's financial relationship with the state amounted to no more than a general contractor's relationship with the state when performing a government contract.

A case similar to the one at hand recently was decided by a federal district court in Texas. In *Arredondo v. Laredo Municipal Transit System*, 581 F.Supp. 868 (S.D. Tex.1984), a discharged employee of a company that operated a municipal transit system filed suit under 42 U.S.C. § 1983 against the company alleging that he had been terminated because of his union involvement. Pursuant to a management agreement virtually identical to the agreement in the instant case, the Transit Management Company, assignee of the rights and obligations of a contract between ATE and the City of Laredo, operated the Laredo Transit System. The *Arredondo* court held that no state action had been shown by the discharged employee because the city exercised no meaningful influence or control over the Transit Management Company's personnel decisions. The court, however, noted that "[t]he evidence discloses no city regulation that would have compelled [p]laintiff's discharge, either in the form of an express command, or an implied power or approval of Transit's actions by the city." *Id.* at 870.

In the instant case, plaintiff contends that state action exists because TMT is the "alter ego" of MTA. Defendants respond that no state action exists because ATE was an independent contractor. Based on the foregoing principles of law, the Court finds that no state action exists in this case.

The Management Agreement between MTA and TMT defines the relationship between the parties very clearly. MTA provides compensation (i.e., employee compensation, services, travel and living expenses, and corporate insurance premiums), other work-related assistance (i.e., equipment, office space, furniture, and supplies), indemnification for unintentional torts, and legal counsel. TMT, in turn, manages the Nashville transit system (i.e., it makes all personnel decisions, maintains the transit equipment, and handles all day-to-day affairs). In the Court's view, the holdings in *Blum* and *Rendell–Baker* squarely preclude a finding that TMT's actions constituted state actions on the basis of this contractual relationship. The government supplied virtually all of the funding for both the school in *Rendell–Baker* and the nursing home in *Blum,* yet the Court likened those entities to private contractors that performed construction contracts. Even if a private contractor, such as TMT, performs only public contracts, its acts are not necessarily those of the government. *Rendell–Baker*, 457 U.S. at 840–41, 102 S.Ct. at 2770–2771.

■ Further, state action cannot be found to exist in the instant case because MTA regulated TMT's activities. The contract between the parties does not require TMT to follow the city's personnel policies, and it expressly deems TMT to be the employer for all employees necessary for Nashville's transit system. In addition, Executive Order No. 23 was not binding on TMT because the Metropolitan City Charter grants to MTA, not the mayor, the authority to control the transit system. This conclusion finds direct support in the decisions of the Supreme Court. In *Rendell–Baker*, the decision to discharge private school personnel was not state action even though the government had the power to approve persons to be hired. In *Blum,* although both state and federal regulations encouraged nursing homes to transfer patients to less expensive facilities when appropriate, the Court did not attribute to the state the actual decision to transfer.

■ Finally, state action does not exist on the ground that TMT performs a public function. "That a private entity performs a function which serves the public does not make its acts state action." *Rendell–Baker*, 457 U.S. at 842, 102 S.Ct. at 2772. As noted earlier, the question is whether the function performed has been "traditionally the exclusive prerogative of the state." *Id.* In this case there was no state action under this test because providing mass transit

services is not an "exclusive prerogative" of the City of Nashville.

In sum, the Court has considered plaintiff's allegations in light of the pertinent legal standards and concluded that no state action exists in this case. Accordingly, plaintiff's claim pursuant to 42 U.S.C. § 1983 must be, and hereby is, DISMISSED.

## C. AGE DISCRIMINATION CLAIM

Plaintiff also alleges discriminatory treatment in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* This Act is designed: "to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; and to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b). More specifically, the objectives of this provision are clearly delineated in 29 U.S.C. § 623(a)(1) and (2), which make it unlawful:

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age.

Two judicial theories have been articulated by the Supreme Court to effectuate these objectives. In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Court enunciated the disparate treatment theory, and in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Court articulated the disparate impact theory. Either theory may be applied to a particular set of facts. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854–1855 n. 15, 52 L.Ed.2d 396 (1977).

"Disparate treatment" ... is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical....

Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive ... is not required under a disparate impact theory.

*Id.* Thus, these theories merely present alternative foundations upon which a court may base liability.

### 1. *Disparate Treatment Theory*

The allocation of the burden of proof in age discrimination cases for wrongful termination based on the disparate treatment theory was articulated by the Sixth Circuit in *Wilkins v. Eaton Corp.,* 790 F.2d 515 (6th Cir.1986). First, plaintiff must establish a prima facie case of age discrimination by showing:

> (1) that he was a member of the protected age group (40 to 70 years of age);
>
> (2) that he was discharged;
>
> (3) that he was qualified for the position; and
>
> (4) that he was replaced by a younger person.

*Id.* at 520. *See Ackerman v. Diamond Shamrock Corp.,* 670 F.2d 66, 99 (6th Cir. 1982).

Second, if the plaintiff proves a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination. *Wilkins,* 790 F.2d at 521. The defendant successfully meets this burden if it "raises a genuine issue of fact as to whether it discriminated against the plaintiff." *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The defendant is not required to convince

the Court that the actual source of its motivation was the *proffered reasons*. *See id.* The plaintiff's "prima facie case of discrimination will be rebutted if the employer articulates lawful reasons for the action; ... the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *See id.* at 257, 101 S.Ct. at 1095–96.

Third, if the defendant satisfies its burden, the plaintiff must demonstrate that the defendant's stated reason "is a mere pretext or 'cover-up' for what was in truth a discriminatory purpose." *Wilkins*, 790 F.2d at 521 (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 (1st Cir.1979)). This issue "requires a consideration of the two opposing reasons for discharge to determine whether [plaintiff's] discharge would not have occurred 'but for defendant's motive to discriminate against him because of his age.'" *Wilkins*, 790 F.2d 230, 240 (4th Cir.1982). Thus, the pretext stage is a critical point in the age discrimination trial not only because the issues are sharpened, but also because the trial court is considering all the evidence in order to determine whether purposeful discrimination has been proven. "The burden of producing evidence of 'pretext' essentially merges with the burden of persuasion, which always lies with the plaintiff." *Wilkins*, 790 F.2d at 522. As in all other civil litigation, the ultimate burden in age discrimination cases of proving by a preponderance of the evidence the existence of discrimination in a challenged employment practice of the defendant is on the plaintiff.

### 2. *Disparate Impact Theory*

The disparate impact theory, which originated in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), focuses on a facially neutral employment practice that falls more harshly on or adversely impacts a protected group, such as persons in the protected age group, than others, *Leftwich v. Harris–Stowe State College*, 702 F.2d 686 (8th Cir.1983); *Geller v. Markham*, 635 F.2d 1027 (2d Cir.1980), and that is not justified by business neces-

sity. *See Albermarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). The *Griggs* Court stated: "[Title VII and, by implication, the ADEA] proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." *Id.* 401 U.S. at 431, 91 S.Ct. at 853. It further stated: "Under [Title VII and, by implication, the ADEA], practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." *Id.* at 430, 91 S.Ct. at 853. Thus, unlike the disparate treatment theory in which proof of discriminatory purpose is critical, plaintiffs proceeding under the disparate impact theory need not show intentional discrimination in order to succeed. "[G]ood intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability." *Id.* at 432, 91 S.Ct. at 854.

The order and allocation of the burden of proof in a disparate impact case is threefold. First, plaintiff "must show that the facially neutral employment practice had a significant discriminatory impact" on a protected group of which plaintiff is a member. *Connecticut v. Teal*, 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982). He must identify a specific practice that results in a discriminatory impact on a class.

The discriminatory impact model of proof in an employment discrimination case is not, however, the appropriate vehicle from which to launch a wide ranging attack on the cumulative effect of a company's employment practices. Nor may just any employment practice be challenged under this model simply because an uneven racial balance exists in an employer's work force. As originally

conceived in *Griggs v. Duke Power Co.,* an action in which a group of black employees challenged their employer's requirement of a high school diploma and a satisfactory score on two aptitude tests for positions in several departments of a power generating facility, the disparate impact theory applied to an *"overt, clearly identified nondiscretionary selection criteri[on] that [was] applied at a single point in a selection process."* D. Baldus & J. Cole, Statistical Proof of Discrimination § 1.23, at 12 (1981 Supp.). *Pouncy v. Prudential Insurance Co.,* 668 F.2d 795, 800 (5th Cir.1982) (emphasis added).

Second, if plaintiff makes out a prima facie case of discrimination, the burden shifts to the defendant to justify its challenged employment practice by showing business necessity or job relatedness. As stated by the *Griggs* court, defendant must demonstrate that "any given requirement [has] a manifest relationship to the employment in question." 401 U.S. at 432, 91 S.Ct. at 854. The Sixth Circuit has stated:

> The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve.

*Head v. Timken Roller Bearing Co.,* 486 F.2d 870, 879 (6th Cir.1973) (quoting *Robinson v. Lorillard Co.,* 444 F.2d 791, 798 (4th Cir.), *cert. denied,* 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971)).

Third, if defendant shows the requisite business purpose, the burden shifts to plaintiff to show that there are alternative employment practices "without similar discriminatory effect which would also serve the employer's legitimate interest in efficient and trustworthy workmanship." *Chrisner v. Complete Auto Transport, Inc.,* 645 F.2d 1251, 1257 (6th Cir.1981). "Such proof is evidence that the employment practice is being used merely as a pretext for discrimination." *Rowe v.*

*Cleveland Pneumatic Co.,* 690 F.2d 88, 94 (6th Cir.1982). *See Albermarle Paper Co.,* 442 U.S. at 425, 95 S.Ct. at 2375; *Connecticut v. Teal,* 457 U.S. at 447, 102 S.Ct. at 2530–2531.

### 3. *Application to Plaintiff's Claims*

■ The Court now considers plaintiff's claims in light of the foregoing legal discussion to determine whether defendants are entitled to summary judgment. First, with respect to the disparate treatment theory, the Court finds that defendants are entitled to summary judgment. The facts articulated by plaintiff contain absolutely no suggestion that Executive Order No. 23 was adopted by defendants as a means of intentionally discriminating against plaintiff because of his age.

■ Second, with respect to the disparate impact theory, the Court again finds that defendants are entitled to summary judgment. As noted above, a plaintiff makes out a prima facie case of disparate impact upon a showing that a facially neutral employment practice had a significant discriminatory impact on a protected group of which plaintiff is a member. Plaintiff has come forward with no proof that anyone other than he has been discharged for failing to meet health qualifications. Some reference is made to other employees by Ben Purnell in his deposition, but his comments plainly cannot support a finding that defendants' adoption and application of Executive Order No. 23 has had a significant discriminatory impact on the protected group of which plaintiff is a part. *See New York City Transit Authority v. Beazer,* 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979).

In sum, the Court has considered plaintiff's allegations in light of the pertinent legal standards and concluded that no genuine issue of material fact precludes entry of summary judgment for defendants. Accordingly, plaintiff's claim pursuant to the ADEA must be, and hereby is, DISMISSED.

428

### III. SUMMARY

Plaintiff in this case is a bus driver who was discharged by Transportation Management of Tennessee, Inc., which operates the Nashville transit system, after he suffered a heart attack. Plaintiff claims that defendants' actions violated two federal statutes, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* In this Memorandum, the Court addresses defendants' motion for summary judgment as to both of these claims. The Court, finding that no genuine issues of material fact preclude entry of summary judgment, and that defendants are entitled to summary judgment as a matter of law, hereby GRANTS the motion. As a result, this lawsuit is DISMISSED.