**Dujuan THOMPSON, Plaintiff,**

v.

**DAVIDSON TRANSIT ORGANIZATION, Defendant.**

Case No. 3:07–cv–0221.

United States District Court, M.D. Tennessee, Nashville Division.

June 25, 2008.

David L. Cooper, Law Office of David L. Cooper, P.C., Nashville, TN, for Plaintiff.

John Thomas Feeney, III, Feeney & Murray, PLLC, Nashville, TN, James N. Foster, Jr., Shawn M. Fusco, McMahon Berger, P.C., St. Louis, MO, for Defendant.

## *MEMORANDUM*

ALETA A. TRAUGER, District Judge.

The defendant has filed a Motion for Summary Judgment (Docket No. 49), to which the plaintiff has responded (Docket No. 57), and the defendant has replied (Docket No. 60). For the reasons discussed herein, the defendant's motion will be denied.

### *FACTUAL BACKGROUND AND PROCEDURAL HISTORY*

The plaintiff, Dujuan Thompson, was employed by the defendant, Davidson Transit Organization (DTO), as a bus driver in the city of Nashville for twelve years.[1] DTO provides employees for the

---

1. Unless otherwise noted, the facts have been drawn from the plaintiff's Amended Complaint (Docket No. 19), the plaintiff's Response to the defendant's Motion for Summary Judgment (Docket No. 57), the plaintiff's Response to the defendant's Statement of Uncontroverted Material Facts (Docket No. 55), and the plaintiff's Statement of Additional Material Facts (Docket No. 56), in accordance with the court's task in analyzing a motion for summary judgment to determine whether the "nonmoving party [has] come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e) (emphasis added)); *see also* Advisory Committee Note to 1963 Amendment of Fed.R.Civ.P. 56(e), 28 U.S.C.App., p.

Metropolitan Transit Authority (MTA), an agency of the Metropolitan Government of Nashville and Davidson County. While employed at DTO, Mr. Thompson was a member of Local 1235 of the Amalgamated Transit Union (ATU). Dissatisfied with the current state of labor negotiations between ATU and DTO, Mr. Thompson and other employees attempted to form their own union and collective bargaining group. In January 2006, Mr. Thompson petitioned the NLRB for certification of the new union.

Mr. Thompson alleges that DTO harassed and retaliated against him for engaging in these activities and also that DTO employees harassed him on the basis of his race. In the year following his union activities, Mr. Thompson was reprimanded and suspended on several occasions. Mr. Thompson alleges that all of these reprimands and suspensions were based on false allegations. These allegations included Mr. Thompson's use of profanity, his failure to complete a pre-trip inspection of his bus, his talking on his cell phone while driving, his not completing a bus run, and behavior constituting sexual harassment. Mr. Thompson claims that similar behavior by other bus drivers went unpunished.

Several of the written and verbal reprimands were issued by Dawn Distler, one of Mr. Thompson's supervisors. DTO board member Ed Oliphant investigated the sexual harassment claim, which he discussed with DTO President Tim Sanderson. Fellow board member Rob Baulsir made the decision to discipline Mr. Thompson. (Docket No. 50, Ex. 13 at p. 2–4)

DTO terminated Mr. Thompson's employment on February 5, 2007, after a motor vehicle accident between Mr. Thompson's bus and a pedestrian. John Curatolo informed Mr. Thompson of his termination. (Docket No. 50, Ex. 17 at p. 3) Before and after his termination, Mr. Thompson filed unsuccessful charges against DTO with the NLRB.

MTA was chartered in 1973 to regulate mass transit in Nashville and Davidson County. The charter gave MTA the option of operating its own transit system (Docket 50, Ex. 4 at p. 8), which MTA has chosen to do. The contract of MTA CEO Paul Ballard states that he "shall have charge of the immediate management and operation of the public mass transit system." (Docket 50, Ex. 6 at p. 9 n.1) In 1990, MTA contracted with McDonald Transit Associates to manage the day-to-day operations of the system. McDonald in turn created Davidson Transit Management (DTM), a wholly owned subsidiary, to employ workers. Defendant DTO was created on December 29, 1992 as a not-for-profit Tennessee corporation. In order to avoid paying a contractor use tax, MTA replaced DTM with the newly chartered DTO on January 1, 1993. No written contract exists or has ever existed between MTA and DTO. The contract with McDonald lapsed in 2002.

The corporate charter creating DTO lists its charitable purpose as the advancement of "public transportation by supporting the Metropolitan Transit Authority, a governmental agency, thereby, lessening the burden of government." (Docket 50,

626 (the purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial"). Where the plaintiff's proof does not adequately rebut the proof provided by the defendant, the court so notes this deficiency by adopting the defendant's fact and

citing to the defendant's pleading, affidavit, or other document. However, where the plaintiff has admitted a fact alleged by the defendant, the court merely draws this fact from the plaintiff's admission, and does not cite to the defendant's pleading, affidavit, or other document.

Ex. 1 at p. 3) By informal agreement, DTO provides MTA with workers to operate and maintain vehicles and to supervise the employees who perform such tasks. DTO hires, fires, disciplines, provides benefits, and sets wage rates for the bus drivers. At least one version of DTO's letterhead describes it as "the employment unit of MTA." (Docket No. 50, Ex. 4 at p. 16) DTO is a party to the transit union's collective bargaining agreement; MTA is not. MTA holds authority over policy-level decisions regarding route planning and resource allocation and also owns the buses and other equipment. DTO submits its payroll figures to MTA, which then issues funds to cover wages and benefits. These funds come from passenger fares and government subsidies. The paychecks are marked "Davidson Transit Organization" (Thompson Dep., Docket No. 50, Ex. 8 at p. 37–38), and DTO deducts union dues.

The two organizations are housed at 130 Nestor Street, a facility owned by MTA. DTO employees use MTA timecards, file accident reports and customer complaints in the MTA database, wear uniforms with the MTA insignia, and use letterhead that features the MTA logo. In addition, DTO employees use municipal email accounts.[2]

The corporate hierarchy of MTA includes a CEO, board of directors, and department heads. Metro government employs the CEO of MTA. MTA itself has no W–2 employees. (Docket No. 50, Ex. 12 at p. 3)

DTO is run by a separate board of directors. Most members of the DTO board, including Mr. Sanderson, Mr. Oliphant, and Mr. Baulsir, also hold titles as MTA department heads.[3] The department heads meet weekly with the CEO of MTA. Approximately twice per year, these meetings include discussions of manpower needs following route changes. Such needs are the only personnel issues discussed at these meetings.

Several lower-level DTO supervisors also hold MTA titles. Dawn Distler holds the title of operations manager for MTA. John Curatolo serves as safety and security manager for MTA. (Sanderson Dep., Docket No. 50, Ex. 3 at p. 40)

Due to the overlap between the two organizations, the ATU initiated an arbitration in 2005 to determine which entity was the actual employer of the union members, including Mr. Thompson, the plaintiff herein. The arbitrator ruled that DTO was the sole employer and that DTO and MTA were indeed separate legal entities. (Docket No. 50, Ex. 12 at p. 29)

On April 19, 2007, Mr. Thompson filed an amended complaint in this court, alleging (1) violation of the First Amendment right to free speech under 42 U.S.C. § 1983, (2) violation of the First Amendment right to free association under 42 U.S.C. § 1983, and (3) malicious harassment under Tennessee state law. (Docket No. 23) On May 2, 2007, DTO moved to dismiss the malicious harassment claim (Docket No. 25), and the court granted that motion on May 24, 2007 (Docket No. 39). On March 14, 2008, DTO filed a motion for summary judgment and, in the alternative, for dismissal based on lack of

---

**2.** i.e. john.doe@nashviile.gov

**3.** The DTO board of directors includes

Tim Sanderson—president of DTO; director of administration for MTA
Robert Baulsir—vice president of DTO; chief operating officer for MTA

Ed Oliphant—secretary/treasurer of DTO; chief financial officer for MTA
Patricia Harris–Morehead—board member at DTO; director of communications for MTA
Jim McAteer—board member at DTO; director of planning for MTA

subject-matter jurisdiction. (Docket No. 49)

## *ANALYSIS*

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). To prevail, the moving party must demonstrate the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Logan v. Denny's, Inc.,* 259 F.3d 558, 566 (6th Cir.2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 800 (6th Cir. 2000). Our function "is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC,* 219 F.3d 547, 551 (6th Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case—provided that the nonmoving party bears the burden for that element—the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.,* 187 F.3d 533, 537–38 (6th Cir.1999). To avoid summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co.,* 285 F.3d 415, 424 (6th Cir.2002). And we must keep in mind that "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.,* 338 F.3d 557, 566 (6th Cir.2003) (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505), If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson,* 477 U.S. at 249–52, 106 S.Ct. 2505. Finally, "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White,* 190 F.3d 427, 430 (6th Cir.1999) (citing *Anderson,* 477 U.S. at 247–49, 106 S.Ct. 2505).

### II. The State Actor Requirement

In order to succeed on a § 1983 claim, the plaintiff must show that he was deprived of a right secured by the federal Constitution or laws of the United States by a person acting under color of state law. *Wolotsky v. Huhn,* 960 F.2d 1331, 1335 (6th Cir.1992). A private entity acts under color of state law when its challenged actions are "fairly attributable" to the state. *Id.* The Supreme Court has set forth three tests to determine whether a defendant's challenged conduct may be fairly attributable to the state: (1) the public function test, (2) the state compulsion test, and (3) the symbiotic relationship or nexus test. *Id.* (citations omitted). "A plaintiff need

only show state action under one of the tests in order to proceed with her claim." *Wilcher v. City of Akron,* 498 F.3d 516, 519 (6th Cir.2007). Mr. Thompson has satisfied the nexus test; accordingly, DTO's summary judgment motion will be denied.

■ In order to satisfy the nexus or entwinement test, the relationship between the public and private entities must be so close that "the action of the latter may be fairly treated as that of the state itself." *Wolotsky,* 960 F.2d at 1335. Further, the relationship between these entities must be implicated in the conduct challenged by the plaintiff. *Lansing v. City of Memphis,* 202 F.3d 821, 831 (6th Cir.2000); *Wolotsky,* 960 F.2d at 1335. It is not enough that the two entities be entwined in some way; they must be entwined with regard to the actions in the case at hand. *Id.* For the sake of clarity, the court will first identify whether entwinement exists at all and, second, whether the conduct at issue is implicated in that entwinement.

### A. The Presence of a Nexus

Precedent provides no clear definition of or set formula for nexus, as the analysis "can be determined only in the framework of the peculiar facts or circumstances present." *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 726, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Nonetheless, courts have consistently held that "neither public funding nor private use of public property is enough to establish a close nexus between state and private actors." *Lansing,* 202 F.3d at 830. In *Adams v. Vandemark,* the Sixth Circuit rejected a nexus argument, even though the defendant non-profit corporation received between ninety and ninety-nine percent of its funding from the government, leased office space from the city, and shared the building with a city agency. 855 F.2d 312, 317 (6th Cir.1988).

In contrast, courts have found state action when a private entity's activities and purpose are "entwined with governmental policies or ... impregnated with a governmental character." *Evans v. Newton,* 382 U.S. 296, 299, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). Such entwinement occurs when "private individuals or groups are endowed by the State with powers or functions governmental in nature." *Id.* In *Evans,* a city had transferred ownership of a municipal park to private trustees in order to maintain a policy of racial segregation, but the past and present involvement of the city with the park's operation was so pervasive that the Court deemed the trustees state actors. *Id.* at 297–98, 301, 86 S.Ct. 486. Operating the park was "an integral part of the City of Macon's activities" prior to the transfer of title, and the Court held that this status was "certainly not dissipated *ipso facto* by the appointment of 'private' trustees." *Id.* at 301, 86 S.Ct. 486. The fact that managing a park was not an exclusively governmental function, and could have been done without any state involvement, was immaterial when the state was indeed involved. *Id.* at 300–01, 86 S.Ct. 486.

Moreover, in *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n,* the Supreme Court held that the presence of public officials within the structure of an ostensibly private entity can create such a "pervasive entwinement" with the state as to transform the entity into a state actor. 531 U.S. 288, 291, 297, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). The Court held that entwinement occurs when "officials acting in their official capacity," *id.* at 299–300, 121 S.Ct. 924, hold positions of "management and control" over a private entity, *id.* at 296, 121 S.Ct. 924 (quoting *Evans,* 382 U.S. at 301, 86 S.Ct. 486). Such circumstances will render that entity a state actor for § 1983 purposes despite its "expressly private

characterization in statutory law." *Id.* (citing *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995)).

In *Brentwood Academy,* public school principals and teachers comprised eighty-four percent of the membership of the defendant association, and fully one hundred percent of its elected board. *Id.* at 298–99, 121 S.Ct. 924. These public officials both set policy by adopting and enforcing the association's regulations and performed the necessary tasks "by which the Association exists and functions in practical terms." *Id.* at 299–300, 121 S.Ct. 924. The Court found that the public entwinement in control and purpose were such that "there would be no recognizable Association, legal or tangible, without the public school officials." *Id.* at 300, 121 S.Ct. 924. The plaintiff in *Brentwood Academy* was challenging the constitutionality of the recruitment regulations adopted by the association; accordingly, the officials were clearly involved in the challenged conduct. *Id.* at 293, 121 S.Ct. 924.

Mr. Thompson has offered a variety of evidence attempting to show a nexus between DTO and MTA. He stresses that DTO and MTA share building space and equipment and that MTA funds DTO; however, the Sixth Circuit rejected almost identical circumstances as insufficient in *Adams,* 855 F.2d at 315. Mr. Thompson also points to DTO employees' use of the municipal email system, as well as their use of MTA time cards, databases, and uniforms. While these facts serve as evidence of a close relationship between MTA and DTO, they do not show that the relationship extends to the challenged conduct, as none of these connections affect personnel decisions.

Mr. Thompson fares better in demonstrating entwinement when he presents evidence of the past and present nature of the relationship between MTA and DTO. Once MTA decided to run its own transit system, providing employees to operate that system became one of its official functions. Indeed, the contract of the MTA CEO states that he "shall have charge of the immediate management and operation of the public mass transit system." (Docket 50, Ex. 6 at p. 9 n.1) Thus, when MTA delegated the role of providing employees to DTO, DTO was "endowed by the State with powers … governmental in nature." *Evans,* 382 U.S. at 299, 86 S.Ct. 486. Since these powers came directly from the State, the fact that they are not exclusive prerogatives of the State is immaterial to the entwinement analysis. *See id.* at 300–01, 86 S.Ct. 486.

The performance of public contracts generally does not render a private entity a state actor. *E.g., Rendell–Baker v. Kohn,* 457 U.S. 830, 841, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). However, unlike the typical independent contractor relationship, no contract exists between MTA and DTO. Further, DTO was created for the sole purpose of supporting MTA, and it exists only in Davidson County. Both of these factors contrast with the relationship between MTA and DTO's predecessor, Transportation Management of Tennessee (TMT), which this court ruled was not a state actor in *Mineo v. Transportation Management of Tennessee, Inc.,* 694 F.Supp. 417, 424 (M.D.Tenn.1988). A contract existed between MTA and TMT and TMT was the subsidiary of a corporation that provided employees for transit services in various other cities in several states. *Id.* at 419.

Mr. Thompson further demonstrates entwinement by arguing that some of the individuals who manage and control DTO are themselves, for some purposes, public officials. Most members of DTO's

board of directors also serve as department heads for MTA, and several of the lower-level supervisors at DTO, including individuals involved with Mr. Thompson's termination, similarly hold MTA titles. While the board and supervisors are employees of DTO, the parties dispute whether these titles show that they serve in a separate capacity at MTA and thus have a public function apart from their DTO duties. DTO President Tim Sanderson explained in his deposition that the individuals serving as both board members and department heads take some actions "in our capacity as employees of MTA" (Sanderson Dep., Docket No. 50, Ex. 3 at p. 36), suggesting that an independent public role does exist for those persons. In addition, the titles themselves give the impression of the imprimatur of the state. Viewing all evidence in favor of the plaintiff, there is at least a disputed issue of fact as to whether these DTO officials are sufficiently "entwined" to serve also as public MTA officers for some purposes.

### B. The Official Capacity Requirement

█ It is not enough that entwinement exists for some purposes; the defendants must have engaged in the challenged conduct in their official capacities. *See West v. Atkins*, 487 U.S. 42, 50, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). An individual acts within his official capacity when he performs the "assigned tasks" of the "position given to him by the State." *Id.* These actions are "made possible only because [he] is clothed with the authority of state law." *Id.* at 49, 108 S.Ct. 2250 (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)). In *West*, the Court rejected the defendant physician's argument that he was not a state actor because he did not work exclusively for the prison where the alleged mistreatment of an incarcerated patient

occurred. *Id.* at 56, 108 S.Ct. 2250. Since he engaged in the challenged conduct while performing his "assigned tasks," the fact that he also served a private function was immaterial. *Id.* at 50, 56, 108 S.Ct. 2250.

Indeed, employment by the state is not dispositive as to a finding that a defendant is a state actor. *Polk County v. Dodson*, 454 U.S. 312, 320, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (finding that a public defender was not a state actor, despite employment by the state). The individual need not be solely employed by the state, or even employed by the state at all, to qualify as a state actor. *West*, 487 U.S. at 56, 108 S.Ct. 2250; *see also Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 627, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (holding that a party can be a state actor even if he does not act "pursuant to any contractual relation with the government"); *United States v. Price*, 383 U.S. 787, 793, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966) ("To act 'under color' of law does not require that the accused be an officer of the State.").

In *Brentwood Academy*, the Court found that "no other view would be rational" than that the officials in that case— principals representing their schools at association meetings—had acted within the scope of their official duties when performing the acts in question. 531 U.S. at 299, 121 S.Ct. 924. As school athletics play an integral role in public education, facilitating such an activity at the association meetings clearly fell within the "assigned tasks" of a principal. *West*, 487 U.S. at 50, 108 S.Ct. 2250. Further, many of the association meetings had occurred during school hours. *Brentwood Academy*, 531 U.S. at 299, 121 S.Ct. 924. By organizing interscholastic activities, the association exercised a power that would otherwise belong to the schools. Rather than serv-

ing in a distinct capacity, the principals were acting through the association to "exercis[e] their own authority to meet their own responsibilities." *Id.*

■] Like the association in *Brentwood Academy,* DTO is managed and controlled by individuals who serve in positions given to them by the state. Moreover, these individuals were exercising that authority when they engaged in the challenged conduct. The "assigned task," West, 487 U.S. at 50, 108 S.Ct. 2250, of DTO's board of directors is overseeing the day-to-day operations of the transit system, including making employment and other personnel decisions. The challenged conduct of disciplining and firing Mr. Thompson was clearly an exercise of this capacity.

As interscholastic sports are an integral part of a public school's mission, furnishing employees to drive the buses is likewise an integral part of MTA's mission. Just as the operation of the park did not lose its status as an integral activity of the city in *Evans* when the trustees took title, 382 U.S. at 301, 86 S.Ct. 486, employing bus drivers remains central to MTA's mission after the transfer of this duty to DTO. DTO thus serves a role that MTA would otherwise have to fill itself. In its relationship with DTO, MTA can be seen as "exercising [its] own authority to meet [its] own responsibilities." *Id.* at 299, 86 S.Ct. 486. And like the association in *Brentwood Academy* which existed solely to facilitate interscholastic athletics among schools in Tennessee, DTO was created solely to serve MTA. As such, DTO would not exist without MTA, just as the association in *Brentwood Academy* would not exist without public school officials, 531 U.S. at 300, 121 S.Ct. 924.

DTO's argument that MTA is not involved with personnel decisions is irrelevant. It is a settled fact that DTO and MTA are separate legal entities and that only DTO is involved with day-to-day operations such as hiring, disciplining, and firing employees. The functions of the two entities are distinct, but their purposes are significantly entwined. The present issue is not whether DTO is indistinguishable from MTA. The two entities are distinct. DTO is nevertheless a state actor because its sole purpose is to support MTA through the state-assigned task of employing individuals to operate the metropolitan transit system.

Mr. Thompson has shown a significant degree of entwinement between MTA and DTO and has shown that DTO employees were acting in their state-assigned capacity when engaging in the challenged conduct. Mr. Thompson has satisfied the nexus test, establishing that DTO is a state actor for purposes of § 1983. Accordingly, the court will deny DTO's motion for summary judgment.

## III. Estoppel

DTO asserts that Mr. Thompson is judicially estopped from arguing that DTO is a state actor because he took a contrary position in proceedings before the NLRB. Alternatively, DTO argues that Mr. Thompson's argument is collaterally estopped because the issue was previously settled in an earlier arbitration proceeding between DTO and Mr. Thompson's union. DTO fails to demonstrate that either judicial or collateral estoppel should apply. Mr. Thompson is not precluded from taking the positions he has adopted in this action.

### A. Judicial Estoppel

■ Judicial estoppel prevents a party from arguing a position in a legal proceeding after succeeding on the contrary position in an earlier proceeding. *New Hampshire v. Maine,* 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001).

The doctrine applies when (1) a party's later position is clearly inconsistent with its earlier position, (2) the party succeeded in persuading a court to accept that party's earlier position, and (3) the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Id.* at 750–51, 121 S.Ct. 1808 (citations omitted).

■ The NLRB's jurisdiction only extends to private-sector employers. Accordingly, DTO argues that, by bringing a complaint against DTO before the NLRB, Mr. Thompson took the position that DTO is a private entity. DTO alleges that this position is inconsistent with Mr. Thompson's present position that DTO can be held liable as a state actor. The defendant has not shown, however, that jurisdiction was ever addressed by the NLRB. Due to that fact, and because Mr. Thompson's NLRB action was dismissed on other grounds, it is far from clear that Mr. Thompson ever succeeded on this specific issue. Moreover, even if the NLRB's exercise of jurisdiction could be said to constitute "success," the two positions are simply not inconsistent. A private entity can be so entwined with public entities as to be liable as a state actor under § 1983. *See Brentwood Academy,* 531 U.S. at 296, 121 S.Ct. 924.

### 1. The "Success" Requirement

■ In the Sixth Circuit, a party can succeed on a specific issue, and judicial estoppel can apply to that issue, even if the party did not succeed on the overall claim. *See Reynolds v. C.I.R.,* 861 F.2d 469, 473 (6th Cir.1988) ("The 'prior success' requirement does not mean that the party against whom the judicial estoppel doctrine is to be invoked must prevail on the merits."). However, the defendant has cited no case, and the court has found none, where judicial estoppel was applied even though the parties did not litigate the allegedly inconsistent position in the prior proceeding. Certainly, the court has found no case where judicial estoppel barred a position purely on the basis of an administrative body's exercise of jurisdiction, where that jurisdiction was never called into question. In fact, the Sixth Circuit seems to require that "the first court has adopted the position *urged by the party,* either as a preliminary matter or as a part of a final disposition" in order for the "success" requirement to have been met. *Edwards v. Aetna Life Ins. Co.,* 690 F.2d 595, 599 n. 5 (6th Cir.1982) (emphasis added).

In *Edwards,* the plaintiff had applied to the Veterans Administration for compensation for active tuberculosis that had developed within three years of his service with the Armed Forces in Vietnam. *Id.* at 597. The Veterans Administration awarded him the benefits. Subsequently, the plaintiff applied for disability benefits from Aetna Life Insurance Co., the insurer for Chrysler, who had employed him directly following his service. *Id.* at 597–98. Aetna rejected his claim; accordingly, the plaintiff sued for benefits, alleging that he had contracted tuberculosis while employed at Chrysler. *Id.* at 598. Even though the plaintiff had actually succeeded on his Veterans Administration claim—at least to the extent that he did receive benefits—the court held that he had not "succeeded" in showing exactly when he had contracted tuberculosis because the Veterans Administration had not addressed that issue. *Id.* at 598–99; *see also Bullard v. Alcan Aluminum Corp.,* 113 Fed.Appx. 684, 689 (6th Cir.2004) ("[J]udicial estoppel applies only if a party successfully asserted an inconsistent position in a prior proceeding.") (emphasis added); *Morawa v. Consolidated Rail Corp.,* 819 F.2d 289 (Table), 1987 WL

37496 at *1 (6th Cir.1987) ("The doctrine of judicial estoppel is applicable when a party who has *successfully and unequivocally asserted* a position in a prior proceeding attempts to assert an inconsistent position in a subsequent proceeding.") (emphasis added). There is absolutely no evidence that the plaintiff urged or unequivocally asserted any factual positions with regard to the NLRB's exercise of jurisdiction except to file his claim, which was ultimately dismissed. Accordingly, DTO has failed to establish the "success" factor.

### 2. The "Inconsistent" Requirement

 Even if the court were to find that the "success" requirement had been met, however, DTO's judicial estoppel claim would nonetheless fail under the "inconsistent" requirement. The NLRB cannot exercise jurisdiction over an employer that is (1) created directly by the state so as to constitute a department or administrative arm of the government or (2) administered by individuals who are responsible to public officials or to the general electorate. *NLRB v. Natural Gas Util. Dist.*, 402 U.S. 600, 604–05, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1971). The Court in *Natural Gas* held that the NLRB's jurisdiction was barred—under the "administered by individuals who are responsible to public officials" grounds—because the administrators of the private entity were appointed and subject to removal by government officials. *Id.* at 605, 91 S.Ct. 1746. By contrast, the Sixth Circuit has held that a state cabinet official's ability to directly review and disapprove personnel decisions of a private entity did not defeat the NLRB's exercise of jurisdiction. *Kentucky River Community Care, Inc. v. NLRB*, 193 F.3d 444, 451–52 (6th Cir.1999).

The position that DTO is a private entity for the purposes of NLRB jurisdiction is not inconsistent with the position that DTO is a state actor for purposes of § 1983. Indeed, the state actor doctrine generally applies to private entities. *See Wolotsky*, 960 F.2d at 1335 (stating that a § 1983 claim involves "determining whether a private party's actions constitute "state action" "). While Mr. Thompson currently argues that MTA and DTO are closely entwined, he does not contend that DTO is actually an administrative arm of the metropolitan government or that DTO's administrators are appointed or removed by the government or the electorate. At most, Mr. Thompson now argues that MTA participates in DTO's personnel decisions, but such an argument, raised before the NLRB, would not have defeated jurisdiction. As the Sixth Circuit held in *Kentucky River*, even a state official's direct oversight of personnel decisions is insufficient to remove a private-sector employer from the NLRB's jurisdiction. 193 F.3d at 451–52. Rather than claiming that DTO is actually a public entity, Mr. Thompson argues only that its ostensibly private actions are "fairly attributable" to the state. *Id.* Accordingly, Thompson's current position is not inconsistent with the NLRB's prior exercise of jurisdiction.

### B. Collateral Estoppel

 Collateral estoppel prevents the relitigation of a previously decided issue. *E.g., Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir.1982). To invoke collateral estoppel, a party must show (1) the precise issue raised in the present case was raised and actually litigated in the prior proceeding, (2) determination of the issue was necessary to the outcome of the prior proceeding, (3) the prior proceeding resulted in a final judgment on the merits, and (4) the party against whom estoppel is sought had a full and fair opportunity to litigate the issue in the prior proceeding. *United States v. Cinemark USA, Inc.*, 348 F.3d 569, 583 (6th Cir.2003) (citing *Air-*

*craft Braking Sys. Corp. v. Local 856, Int'l Union,* 97 F.3d 155, 161 (6th Cir.1996).)

■ DTO asserts that the arbitrator's decision that DTO existed independently of MTA and was Mr. Thompson's sole employer precludes Mr. Thompson's current argument that DTO is a state actor. However, the arbitration did not address any § 1983 civil rights claims and as such did not consider whether DTO was a state actor. That precise issue was thus neither raised nor "actually litigated" at all. *Cinemark,* 348 F.3d at 583. The parties do not currently dispute that MTA and DTO are separate entities or that DTO was Mr. Thompson's employer. While similar, the issue decided by the arbitrator is not equivalent to the issue at hand; a public and a private entity can be legally independent yet sufficiently connected in their activities and purpose for the latter to qualify as a state actor. *See Brentwood Academy,* 531 U.S. at 296, 121 S.Ct. 924. Since the arbitration simply did not address the central issue of the current case—whether DTO is a state actor—collateral estoppel is inapplicable.

Moreover, it is uncertain as to whether the doctrine of collateral estoppel could even apply to the arbitrator's decision. While arbitration generally has estoppel effect, the Sixth Circuit recently reiterated that arbitration related to contractual rights under a collective bargaining agreement may not estop an employee from pursuing an individual claim such as a civil rights violation. *Nance v. Goodyear Tire & Rubber Co.,* 527 F.3d 539, 547 (6th Cir. 2008). Adverse arbitration decisions may thus lack estoppel effect against § 1983 claims. *McDonald v. West Branch,* 466 U.S. 284, 290, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984) ("[A]lthough arbitration is well suited to resolving contractual disputes, ... it cannot provide an adequate substitute for a judicial proceeding in protecting the federal statutory and constitutional rights that § 1983 is designed to safeguard."). As the arbitrated dispute centered on the collective bargaining agreement between DTO and Mr. Thompson's union (Docket 50, Ex. 12 at p. 4), its estoppel effect is limited. The protection of civil rights merits a more cautious application of collateral estoppel than DTO seeks to establish.

## CONCLUSION

For the reasons stated herein, the defendant's Motion for Summary Judgment will be denied.

An appropriate order will enter.

## ORDER

For the reasons expressed in the accompanying Memorandum, the Motion for Summary Judgment (Docket No. 49) filed by the defendant, Davidson Transit Organization, is **DENIED.**

It is so ordered.